[S.F. No. 24347. Oct. 18, 1982.]

DEBRA JEAN MORRIS, Petitioner, v.
THE MUNICIPAL COURT FOR THE SAN JOSE-MILPITAS
JUDICIAL DISTRICT OF SANTA CLARA COUNTY, Respondent;
THE PEOPLE, Real Party In Interest

554

COUNSEL

Stuart C. Rich and Lisa E. Wochos for Petitioner.

No appearance for Respondent.

Louis P. Bergna, District Attorney, and Joseph V. Thibodeaux, Deputy District Attorney, for Real Party in Interest.

**OPINION**

**THE COURT—**

I

Debra Jean Morris seeks a writ of prohibition directed to the San Jose-Milpitas Municipal Court in Santa Clara County, barring her prosecution for violation of county ordinance No. B13-14, which prohibits nude entertainment in any public place other than a concert hall, theater, or similar establishment "primarily devoted to theatrical performances." She contends, principally, that the ordinance is overbroad and thus infringes her First Amendment protection of freedom of expression and similar protection afforded by article I, sections 2 and 3 of the California Constitution. Although we upheld local ordinances similar to the one at issue here in *Crownover* v. *Musick* (1973) 9 Cal.3d 405 [107 Cal.Rptr. 681, 509 P.2d 497], later decisions of the United States Supreme Court compel us to hold that *Crownover* went too far in permitting the exclusion of all nude entertainment, some of which enjoys First Amendment protection. ■■ ■■■ ■■ We conclude that Morris is entitled to the writ she seeks.[1]

II

Petitioner was employed as a dancer at the Hiphugger, a San Jose bar. On October 11, 1978, she was arrested for having exposed her buttocks during a performance in violation of Santa Clara Ordinance No. B13-14 (a)(3). A formal complaint charging her with violation of the ordinance was filed on October 26, 1978.

On February 16, 1979, the municipal court sustained Morris' demurrer without leave to amend on the grounds that B13-14 is unconstitutionally vague. However, on petition by the county, the Superior Court of Santa Clara County issued a peremptory writ of mandate ordering the municipal court to vacate its order sustaining the demurrer. The superior court cited *Crownover* v. *Musick, supra,* 9 Cal.3d 405 as authority. On October 2, 1980, the Court of Appeal affirmed the writ of mandate (1 Civ. 48086). This court denied a hearing on January 28, 1981. Morris then filed a notice of appeal to the United States Supreme Court, which was dismissed for want of jurisdiction. Three justices noted probable jurisdiction.

---

[1] "Where a criminal statute or ordinance sought to be enforced is alleged to be unconstitutional on its face, a petition for a writ of prohibition is an appropriate method of seeking relief." (*Dulaney* v. *Municipal Court* (1974) 11 Cal.3d 77, 81 [112 Cal.Rptr. 777, 520 P.2d 1].)

Citing a number of recent federal decisions which cast doubt on the continued validity of our analysis in *Crownover, supra,* Morris now seeks in this court a writ of prohibition to bar the municipal court from proceeding with the criminal action against her.

The ordinance which petitioner is charged with violating states: "Every person . . . who acts as a waiter, waitress or entertainer in any establishment which serves food, beverages, or food and beverages, including, but *not limited to alcoholic beverages* . . . or . . . participat[es] in any live act, demonstration or exhibition in any public place, place open to the public or place open to public view, and who performs such activity in the nude . . . .is guilty of a misdemeanor." (Italics added.) The ordinance defines "nude" as "the simulated, the uncovered, or less than opaquely covered: [¶] (1) male or female genitals [¶] (2) pubic areas [¶] (3) buttocks [¶] (4) female breast [¶] (5) female breast with only the nipple and areola covered." The ordinance specifically exempts performances in theaters, concert halls and similar establishments "primarily devoted to theatrical performances," provided such establishments have "permanently affixed seats so arranged that a body of spectators can have an unobstructed view of the stage."[2]

Santa Clara had adopted the ordinance under attack pursuant to Penal Code sections 318.5 and 318.6, which permit cities or counties to legislate on the subject of nude entertainment. Section 318.5, the enactment more pertinent to the present case, states in relevant part: "Nothing in this code shall invalidate an ordinance of, or be construed to prohibit the adoption of an ordinance by, a county or city, if such ordinance directly regulates the exposure of the genitals or buttocks of or the breasts of any person who acts as a waiter, waitress, or entertainer . . . in an establishment which serves food, beverages, or food and beverages, including, but not limited to, alcoholic beverages, for consumption on the premises of such establishment. [¶] The provisions of this section shall not apply to a theater, concert hall, or similar establishment which is primarily devoted to theatrical performances."[3] As explained in *Crownover*, sections 318.5 and 318.6

---

[2] Morris also contends that the so-called theater exception is unconstitutionally vague. Since we conclude on other grounds that the ordinance at issue is unconstitutionally overbroad, we do not address that issue.

[3] Section 318.6 provides that: [¶] "Nothing in this code shall invalidate an ordinance of, or be construed to prohibit the adoption of an ordinance by, a city or county, if such ordinance relates to any live acts, demonstrations, or exhibitions which occur in public places, places open to the public, or places open to public view and involve the exposure of the private parts or buttocks of any participant or the breasts of any female participant, and if such ordinance prohibits an act or acts which are not expressly authorized or prohibited by this code. [¶] The provisions of this section shall not apply to a theater, concert hall, or similar establishment which is primarily devoted to theatrical performances."

"perform no active role in the adoption of the designated kind of ordinance; they merely permit cities and counties to adopt such an ordinance if they so desire." (9 Cal.3d at p. 416.)

### III

Our concern here transcends the specific conduct in which Ms. Morris engaged, which, for all we know, may have involved a good deal more than the mere baring of her buttocks and may, in fact, have been obscene. That is not the issue. (2) For, "even though a statute or ordinance may be constitutionally applied to the activities of a particular defendant, that defendant may challenge it on the basis of overbreadth if it is so drawn as to sweep within its ambit protected speech or expression of other persons not before the Court." (*Doran* v. *Salem Inn, Inc.* (1975) 422 U.S. 922, 933 [45 L.Ed.2d 648, 660, 95 S.Ct. 2561].) This, of course, is "[b]ecause overbroad laws, like vague ones, deter privileged activity . . . " (*Grayned* v. *City of Rockford* (1972) 408 U.S. 104, 114 [33 L.Ed.2d 222, 231, 92 S.Ct. 2294].)

The dance performed by Ms. Morris was undoubtedly more offensive to the residents of Santa Clara than other entertainments which may be performed in the nude—ballet, for example. But the First Amendment does not generally permit courts or legislatures to distinguish between these activities. "[I]t is largely because governmental officials cannot make principled distinctions in this area that the Constitution leaves matters of taste and style so largely to the individual." (*Cohen* v. *California* (1971) 403 U.S. 15, 25 [29 L.Ed.2d 284, 294, 91 S.Ct. 1780].) "[W]hile the entertainment afforded by a nude ballet at Lincoln Center to those who can pay the price may differ vastly in content (as viewed by judges) or in quality (as viewed by critics), it may not differ in substance from the dance viewed by the person who, having worked overtime for the necessary wherewithal, wants some 'entertainment' with his beer or shot of rye." (*Salem Inn, Inc.* v. *Frank* (2d Cir. 1974) 501 F.2d 18, 21, fn. 3; on remand, 522 F.2d 1045, 1048.) We must concern ourselves with any form of entertainment which falls within the strictures of the Santa Clara ordinance.

Our opinion in *Crownover* rested on alternative grounds. First the majority stated that the disputed ordinances regulated conduct, not speech: "They do not prohibit entertainment but merely enjoin that if the entertainer or performer offers it, he or she must have some clothes on." (*Id.*, 9 Cal.3d at p. 425.) Such nude entertainment, the majority stated, is

nothing but a "sales gimmick" (*id.*, at p. 426) devoid of communicative expression.[4]

Alternatively, assuming such conduct included a communicative element, the majority tested the ordinances under the formula set out in *United States* v. *O'Brien* (1968) 391 U.S. 367 [20 L.Ed.2d 672, 88 S.Ct. 1673] to determine the validity of restrictions upon symbolic speech. In applying this formula, the majority stated that the regulations furthered an important or substantial governmental interest in promoting public morals,[5] an interest that did not relate to the suppression of free expression, and did not impose any greater restriction than that essential to further this governmental interest.

The applicability of *O'Brien* in this context is doubtful. As the *Crownover* dissent noted: "The grounds for distinction between *O'Brien* and the present case are manifold. *O'Brien* involved a law which prohibited burning of draft cards wherever that conduct occurred, and which did not on its face aim at regulation of protected speech; the ordinances at bar proscribe nudity only when it occurs in the context of protected communicative entertainment. The act of burning a draft card bears no integral relation to protected communication; the costuming of an entertainer is unquestionably an integral part of the entertainment. The language in *O'Brien* on which the majority rely discusses the

---

[4]The dissenting opinion in *Crownover* criticized the majority's distinction between conduct and protected communication: "The adoption of this theory would let the censor loose without constitutional restriction to condemn at will any and all communicative entertainment. While avoiding reference to the actor's speech, the state could ban his gestures, his costuming (or amount of costuming), the positioning of the actors, the lighting of the stage, or whatever other 'conduct' it chooses . . . . If a county seeks to prohibit entertainers, or participants in a public demonstration, from wearing long hair, unfashionable dress, or uniforms [citation omitted], the majority opinion can be construed to uphold such legislation." (9 Cal.3d at p. 436; dis. opn. Tobriner, J.)

[5]The majority explained its conclusion that the ordinances further an important governmental interest: "[I]t cannot be gainsaid that the regulations further 'an important or substantial governmental interest' (*United States* v. *O'Brien, supra,* 391 U.S. 367, 377 . . . ), in promoting public morals. It is our province to take note of public morality, not to dictate it. In this pluralistic society we cannot say that a 'topless' female or a 'bottomless' or nude person of either sex in a public place or place open to the public is 'socially commonplace' [citation omitted] . . . . Indeed, the instant legislation conceivably gives some indication that such nude conduct is not in accord with the *mores* of the people as a whole." (*Crownover, supra,* 9 Cal.3d at p. 427; italics in original.)

As noted by the dissent, this explanation is incomplete; the fact that some persons consider certain behavior immoral does not demonstrate that the state has an important or substantial interest in suppressing that behavior. (See 9 Cal.3d at pp. 442-443, dis. opn. Tobriner, J.) Time has proven the dissent correct. As will be discussed, in *Erznoznik* v. *City of Jacksonville* (1975) 422 U.S. 205, 211 [45 L.Ed.2d 125, 132, 95 S.Ct. 2268], the United States Supreme Court flatly rejected the argument that public morals alone may justify a prohibition on outdoor movies depicting nudity.

constitutionality of a law regulating conduct *as applied* to an act of 'symbolic speech'; the present case concerns the constitutionality on its face of ordinances regulating protected activity. [¶] Finally, and most important, in *O'Brien* the court extended limited First · Amendment protection to 'symbolic speech'—conduct which, normally noncommunicative, is invested with symbolic significance by the protestant. The present case has nothing to do with symbolic speech. It has nothing to do with protest. It concerns communicative entertainment, an activity which heretofore has been entitled not to limited but to *full protection* under the First Amendment." (9 Cal.3d at p. 439; italics in original.) Significantly, no subsequent decision of the Supreme Court has been based on application of the *O'Brien* test. (See *Chase* v. *Davelaar* (9th Cir. 1981) 645 F.2d 735, 740, fn. 14.)

While *Crownover* was pending before us, the United States Supreme Court upheld the regulations on nude entertainment promulgated by the California Alcoholic Beverage Control Board. (*California* v. *LaRue* (1972) 409 U.S. 109 [34 L.Ed.2d 342, 93 S.Ct. 390].) The high court's decision, however, contained language which suggested that similar regulations would not be valid if they extended to places which did not serve alcohol. The court stated, "While we agree that at least some of the performances to which these regulations address themselves are within the limits of the constitutional protection of freedom of expression, the critical fact is that California has not forbidden these performances across the board. It has merely proscribed such performances in establishments that it licenses to sell liquor by the drink . . . . [¶] . . . Given the added presumption in favor of the validity of the state regulation in this area that the Twenty-first Amendment requires, we cannot hold that the regulations on their face violate the Federal Constitution." (409 U.S. at pp. 118-119 [34 L.Ed.2d at p. 352]; fn. omitted.) The majority opinion in *Crownover*, however, rejected that implication and construed *LaRue* as extending constitutional protection only to motion pictures and theatrical productions. (See 9 Cal.3d at p. 428, fn. 15.)

A review of the significant decisions of other jurisdictions in the years following *Crownover* reveals that the majority in *Crownover* failed to anticipate future developments in the law in several respects. *Crownover's* discussion of *LaRue*, and its failure to recognize the constitutional significance of *LaRue's* distinction between places which serve alcohol and those which do not, have proven to be plainly erroneous. Both *Crownover's* alternative holdings that nudity in dance is conduct and, as such, beyond the scope of First Amendment protection, or that public opposition to nude entertainment generates a substantial state interest in its suppression, also crumble under the force of later decisions.

The first such decision, *Doran* v. *Salem Inn, Inc., supra,* 422 U.S. 922, presented the United States Supreme Court with a case very similar to the one now before us. The town of North Hempstead, New York, enacted an ordinance banning topless performances in all public places. The owners of three topless bars sued to enjoin enforcement of the ordinance. The town appealed from a preliminary injunction, raising the issue whether plaintiffs "made a sufficient showing of the likelihood of ultimate success on the merits." (*Id.,* at p. 932 [45 L.Ed.2d at p. 660].)

Although the town relied on *California* v. *LaRue, supra,* 409 U.S. 109, the United States Supreme Court distinguished that precedent. *LaRue,* it said, held only "that the broad powers of the States to regulate the sale of liquor, conferred by the Twenty-first Amendment, outweighed any First Amendment interest in nude dancing . . . " (422 U.S. at p. 932 [45 L.Ed.2d at p. 660].) The North Hempstead ordinance, on the other hand, "applies not merely to places which serve liquor, but to many other establishments as well."[6] (*Id.,* at p. 933 [45 L.Ed.2d at p. 660].) Sustaining the preliminary injunction,[7] the court noted that the town did not "raise any other legitimate state interest [beyond the interest in regulating the sale of alcohol] that would counterbalance the constitutional protection presumptively afforded to activities which are plainly within the reach of [the ordinance]." (*Id.,* at p. 934 [45 L.Ed.2d at p. 661].) The opinion does not state whether the town asserted an interest in protecting public morals, but since public morality (not the regulation of alcohol) was the driving force behind the ordinance (see Comment, *Topless Dancing and the Constitution: A New York Town's Experience* (1976) 25 Buffalo L.Rev. 753, 755-759), we must infer the court considered this interest and found it insufficient.

---

[6]The United States Supreme Court quoted with approval the decision of the district court describing the ordinance: " ' "The local ordinance here attacked not only prohibits topless dancing in bars but also prohibits any female from appearing in "any public place" with uncovered breasts. There is no limit to the interpretation of the term "any public place." It could include the theater, town hall, opera house, as well as a public market place, street or any place of assembly, indoors or outdoors. Thus, this ordinance would prohibit the performance of the "Ballet Africains" and a number of other works of unquestionable artistic and socially redeeming significance.' " (*Doran, supra,* 422 U.S. at p. 933 [45 L.Ed.2d at p. 660].) The ordinance at issue in the present case could also be construed to ban performance of works of unquestionable artistic and socially redeeming significance if such works were performed in a setting other than a theater, concert hall, or similar establishment primarily devoted to theatrical performance.

[7]Because *Doran* involved a preliminary injunction, the precise issue was whether the plaintiffs had "made a sufficient showing of the likelihood of ultimate success on the merits." (*Id.,* at p. 932 [45 L.Ed.2d at p. 660].) Therefore, the Supreme Court's decision was not a holding that the ordinance was, indeed, void for overbreadth. The decision, however, necessarily implied that an ordinance not limited to places which serve liquor is unconstitutional unless supported by a substantial state interest, and it has been so interpreted by lower courts.

Following the decision in *Doran*, the town of North Hempstead amended its ordinance to ban topless dancing only in bars, restaurants, and similar establishments. The Court of Appeals for the Second Circuit nevertheless affirmed a permanent injunction against enforcement of the amended ordinance on the ground that it still applied "to places *not* serving alcoholic beverages . . . ." (*Salem Inn, Inc.* v. *Frank* (2d Cir. 1975) 522 F.2d 1045, 1047; italics in original.) "[W]e recognize," the court said, "that there is only a modicum of expression involved in the conduct of appellees' dancers. But that modicum is one of constitutional significance . . . ."[8] (*Id.,* at p. 1048.) If the town, attempting to prohibit topless dancing in some establishments and not others, falls "between the Scylla of overbreadth and the Charybdis of unequal protection, this is because it is attempting to regulate matters which the First Amendment leaves to personal choice." (*Id.,* at p. 1049.)

Subsequent cases followed the lead of the Supreme Court and the Second Circuit. (See *Saxe* v. *Brennan* (E.D.Wis. 1976) 416 F.Supp. 892, 894-895, affd. (7th Cir. 1976) 544 F.2d 521; *Attwood* v. *Purcell* (D.Ariz. 1975) 402 F.Supp. 231, 236; *Koppinger* v. *City of Fairmont* (1976) 311 Minn. 186 [248 N.W.2d 708, 714-716]; *People* v. *Nixon* (1976) 88 Misc.2d 913 [390 N.Y.S.2d 518]; *Lucifer's Gate* v. *Town of Van Buren, Etc.* (1975) 83 Misc.2d 790 [373 N.Y.S.2d 304].) In 1978, the Supreme Judicial Court of Massachusetts described the trend of decisions: "Before 1975 prohibition of topless or bottomless dancing in designated establishments was widely upheld as directed against conduct rather than speech. [Citing nine cases, including *Crownover*.] But it now seems clear that such ordinances violate the First Amendment if not limited to places dispensing alcoholic beverages." (*Commonwealth* v. *E. Gregory Sees* (1978) 374 Mass. 532, 535-536 [373 N.E.2d 1151, 1154-1155].)

A recent decision of the United States Court of Appeals for the Ninth Circuit confirms this conclusion. In *Chase* v. *Davelaar, supra,* 645 F.2d 735, the court upheld an injunction barring enforcement of a county ordinance nearly identical to the ordinance at issue here. The court observed that had the ordinance "applied only to establishments that sell alcoholic beverages, it would apparently have been constitutional . . . ." (*Id.,* at p. 738.) "There can be no doubt," the court stated, that the

---

[8]The dissent appears to miss this crucial observation—asserting that the United States Supreme Court in *Doran* accorded the "'barest minimum' protection" to nude dancing. In fact, the court stated that nude dancing may *involve* "the barest minimum of protected expression." (*Id.,* 422 U.S. at p. 932 [45 L.Ed.2d at p. 660].) Of course, even a performance that involves the barest minimum of protected expression is entitled to *full* First Amendment protection.

ordinance "is overbroad. It bans the display of breasts in any place that serves food or beverages, alcoholic or not, that is not a 'theater, concert hall or other similar establishment . . . primarily devoted to theatrical peformances'. . . . Moreover, the [ordinance] would prevent the affected establishments from offering entertainment that is *not* obscene under current law, since nudity alone is not sufficient to make material legally obscene. [Citation omitted.] Such non-obscene entertainment is protected by the First Amendment." (645 F.2d at p. 737; italics in original; fn. omitted.)[9]

We turn next to the most recent United States Supreme Court decision, *New York State Liquor Authority* v. *Bellanca* (1981) 452 U.S. 714, [69 L.Ed.2d 357, 101 S.Ct. 2599], which upheld a New York statute prohibiting nude dancing in establishments licensed for on-premises consumption of liquor, concluding that "[w]hatever artistic or communicative value may attach to topless dancing is overcome by the State's exercise of its broad powers arising under the Twenty-first Amendment . . . ." (*Id.,* at p. 718 [69 L.Ed.2d at p. 361].) The *Bellanca* court distinguished *Doran* noting: "What the New York Legislature has done in this case is precisely what this Court has said a State may do in *Doran. Pursuant to its power to regulate the sale of liquor* within its boundaries, it has banned topless dancing in establishments granted a license to serve liquor . . . . [¶] . . . Although some may quarrel with the wisdom of . . . legislation [barring nude or topless dancing] . . . , the Twenty-first Amendment makes that a policy judgment for the state legislature, not the courts." (452 U.S. at pp. 717-718 [69 L.Ed.2d at p. 361]; italics added.) The court's explicit reliance on the Twenty-first Amendment confirms the holding of earlier cases that a prohibition on nude dancing which extends beyond the reach of the Twenty-first Amendment to encompass establishments which do not serve liquor is overbroad.[10]

---

[9]The dissent simply ignores the Ninth Circuit's holding in *Chase*. Its importance should not be underestimated. It not only confirms the holdings of a growing number of state and federal courts, but, as a practical matter, it means that, were we to rule that *Crownover* remains viable, Ms. Morris could, if convicted, simply move across the street to the federal court and obtain a writ of habeas corpus after exhausting her state remedies. (See 28 U.S.C. § 2254 (1976 & Supp. IV 1980).)

[10]Justice Stevens, dissenting in *Bellanca*, observed: "Although the Court has written several opinions implying that nude or partially nude dancing is a form of expressive activity protected by the First Amendment, the Court has never directly confronted the question." (452 U.S. at pp. 718-719 [69 L.Ed.2d at p. 362]; fn. omitted.) The implication to which Justice Stevens refers, however, is quite a strong one. The court's distinction between an establishment which serves alcohol and one which does not, a distinction central to its opinions in both *California* v. *LaRue, supra,* 409 U.S. 109, and

From our review of the foregoing decisions, we draw vital conclusions. (1) A ban on nude dancing cannot be sustained on the theory that it regulates only conduct and does not impinge upon protected speech. Nonobscene nude dancing cannot be barred without, in some cases, infringing upon constitutionally protected expression.[11]

(2) An enactment prohibiting nonobscene nude dancing which extends beyond establishments serving alcohol is presumptively overbroad.[12] Each of these conclusions is fundamentally at odds with the reasoning of the *Crownover* majority. We conclude that the analysis in *Crownover* is no longer viable, and declare that, to the extent that it is

---

*Bellanca*, would be pointless if nude entertainment can claim no constitutional protection in either establishment. Likewise much of the court's language and discussion in *Doran* v. *Salem Inn, Inc.*, *supra*, 422 U.S. 922 and *Schad* v. *Mount Ephraim* (1981) 452 U.S. 61 [68 L.Ed.2d 671, 101 S.Ct. 2176] necessarily rests on an assumption that nude dancing is entitled to some measure of protection under the First Amendment.

On remand from the United States Supreme Court, the New York Court of Appeal held that ordinances prohibiting topless dancing in premises licensed by the state liquor board violate the state Constitution's free speech guarantees. (*Bellanca* v. *New York State Liquor Authority* (1981) 54 N.Y.2d 228 [445 N.Y.S.2d 87].) Explaining its decision, the court noted: "[T]he guarantee of freedom of expression set forth in our State Constitution is of no lesser vitality than that set forth in the Federal Constitution (considered without reference to the curtailing effect of its Twenty-first Amendment). Our State Constitution contains no provision modifying the State guarantee of freedom of expression corresponding to what the Supreme Court has held is the diminishing effect of the Twenty-first Amendment with respect to the Federal guarantee of freedom of expression . . . . [¶] Nor is there anything in the Twenty-first Amendment itself which inhibits or modifies the right of freedom of expression assured by our State Constitution." (54 N.Y.2d at p. 235*; see also *Mickens* v. *City of Kodiak* (Alaska 1982) 640 P.2d 818.)

*445 N.Y.S.2d at page 90.

[11] *In re Giannini* (1968) 69 Cal.2d 563, 567-568 [72 Cal.Rptr. 655, 446 P.2d 535], stated that "[a]lthough the United States Supreme Court has not ruled on the precise question whether the performance of a dance is potentially a form of communication protected against state intrusion by the guarantees of the First and Fourteenth Amendments to the federal Constitution, the very definition of dance describes it as an expression of emotions or ideas. Thus, 'Dancing consists in the rhythmical movement of any or all parts of the body in accordance with some scheme of individual or concerted action which is expressive of emotions or ideas.' (7 Encyclopaedia Britannica (1945) pp. 13-14.) . . . 'The dance is perhaps the earliest and most spontaneous mode of expressing emotion and dramatic feeling; it exists in a great variety of forms and is among some people connected with religious belief and practice, as among the Mohammedans and Hindus.' (2 The Century Dictionary and Cyclopedia (1914) p. 1450.)"

In the years after *Giannini*, the Supreme Court has confirmed that dance is a medium of expression protected by the federal Constitution. (*Schad* v. *Mount Ephraim, supra*, 452 U.S. 61, 65-66 [68 L.Ed.2d 671, 678]; *Doran* v. *Salem Inn, Inc., supra*, 422 U.S. 922, 932 [45 L.Ed.2d 648, 659-660].)

[12] It is well settled that "a litigant whose own activities are unprotected may nevertheless challenge a statute by showing that it substantially abridges the First Amendment rights of other parties not before the court." (*Schaumburg* v. *Citizens for Better Environ.* (1980) 444 U.S. 620, 634 [63 L.Ed.2d 73, 85-86, 100 S.Ct. 826]; see also *Grayned* v. *City of Rockford, supra*, 408 U.S. 104, 114 [33 L.Ed.2d 222, 231].) Consequently, each of the cases discussed in our review of decisions subsequent to

inconsistent with the present opinion, *Crownover* v. *Musick, supra,* 9 Cal.3d 405, is overruled.[13]

## IV

██ ██ ██ ██ ██ The conclusion that ordinance No. B13-14 affects protected values does not necessarily require us to strike it down.[14] In *Schad* v. *Mount Ephraim, supra,* 452 U.S. 61, 68 [68 2L.Ed.2d 671, 680], the United States Supreme Court suggested that an ordinance which "infringes upon a protected liberty," such as the one at issue here, may nevertheless be sustained if it is "narrowly drawn" and furthers "a sufficiently substantial government interest." (Fn. omitted.) *Schad* further directs that courts "must not only assess the substantiality of the governmental interests asserted but also determine whether those interests could be served by means that would be less intrusive on activity protected by the First Amendment . . . " (*Id.,* at p. 70 [68 L.Ed.2d at p. 681].)

In *Schad,* the owner of an adult bookstore which presented nude dancing challenged the validity of borough zoning regulations which failed to provide for any form of commercial entertainment within borough limits. Reviewing the various interests advanced by the borough to sustain the regulations—community planning concerns, parking problems, need for police protection, and similar matters—the court found those interests insufficient.[15] It cautioned that "'[m]ere legislative preferences or

---

*Crownover* holds expressly that a plaintiff who serves alcohol nevertheless has standing to attack the overbreadth of an enactment which bans nude dancing in establishments that do not serve alcohol.

[13]Language in *Theresa Enterprises, Inc.* v. *Davis* (1978) 81 Cal.App.3d 940 [146 Cal.Rptr. 802]; *Renba Lil* v. *Kortz* (1976) 65 Cal.App.3d 467 [135 Cal.Rptr. 287], and *People* v. *Conway* (1979) 103 Cal.App.3d Supp. 7 [162 Cal.Rptr. 877]—lower court decisions which relied on *Crownover*—is disapproved to the extent it is inconsistent with the present opinion.

[14]As the Ninth Circuit noted in *Chase* v. *Davelaar, supra,* 645 F.2d at page 738, "Simply because [the disputed ordinance] is overbroad does not mean that it must automatically be held invalid. The Supreme Court has held that 'particularly where conduct and not merely speech is involved, . . . the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep' to justify invalidating the statute. (*Broadrick* v. *Oklahoma,* 413 U.S. 601, 615, 93 S.Ct. 2908, 2918, 37 L.Ed.2d 830 (1973).)"

[15]In addition, the court stated that the zoning provision could not be sustained as a time, place, and manner regulation because: "Here, the Borough totally excludes all live entertainment, including nonobscene nude dancing that is otherwise protected by the First Amendment." (452 U.S. at p. 76 [68 L.Ed.2d at p. 685].) Similarly, the instant ordinance may not be upheld as a time, place and manner restriction because it completely bars nude or seminude entertainment. The dissent appears to confuse this issue, placing heavy reliance on *Young* v. *American Mini Theaters* (1976) 427 U.S. 50 [49 L.Ed.2d 310, 96 S.Ct. 2440], which considered limited geographical *regulation* of adult entertainment—not outright prohibition. (See dis. opn. at pp. 573, 575, 576.) The *Young* court

beliefs respecting matters of public convenience may well support regulation directed at other personal activities, but be insufficient to justify such as diminishes the exercise of rights so vital to the maintenance of democratic institutions . . . . [Courts must] weigh the circumstances and . . . appraise the substantiality of the reasons advanced in support of the regulation of the free enjoyment of [First Amendment] rights.'" (*Id.*, 452 U.S. at pp. 69-70 [68 L.Ed.2d at p. 681]; *Schneider* v. *State* (1939) 308 U.S. 147, 161 [84 L.Ed.2d 155, 164-165, 60 S.Ct. 146].)

■■■ The county argues that its interest in "the promotion of public morals" is sufficiently substantial to uphold the ordinance. While undoubtedly the desire to control what may be viewed as immoral behavior is one of the reasons, often inarticulated, for the passage of most ordinances such as the one at issue here, *Schad* and *Doran* demonstrate that it is insufficient.

In *Schad*, the high court considered a contention similar to that of the ounty, noting "Mount Ephraim . . . speculates that the Borough may 1ave concluded that live nude dancing is undesirable." (452 U.S. at p. 73, fn. 15 [68 L.Ed.2d at p. 683].) Distinguishing *California* v. *LaRue, supra*, 409 U.S. 109, the court explained that such "speculation lends no support to the challenged ordinance. First, [the regulation] excludes all live entertainment, not just live nude dancing. Even if Mount Ephraim might validly place restrictions on certain forms of live nude dancing under a narrowly drawn ordinance, this would not justify the exclusion of all live entertainment or, insofar as this record reveals, *even the nude dancing involved in this case.* Second, the regulation challenged in *California* v. *LaRue* was adopted only after the Department of Alcoholic Beverage Control had determined that significant problems were linked to the activity that was later regulated. Third, in *California* v. *LaRue* the Court relied heavily on the State's power under the Twenty-first Amendment. Cf. *Doran* v. *Salem Inn, Inc.*, 422 U.S. 922 [95 S.Ct. 2561, 45 L.Ed.2d 648] (1975)." (452 U.S. at pp. 73-74, fn. 15 [68 L.Ed.2d at p. 683]; italics added.)

This language necessarily implies that the belief of a majority of the community that nude dancing is immoral is not in itself a sufficiently

---

specifically noted: "The situation would be quite different if the ordinance had the effect of suppressing, or greatly restricting access to, lawful speech." (*Id.*, at p. 71 fn. 35 [49 L.Ed.2d at p. 327].

substantial state interest to justify a total prohibition of that form of entertainment in establishments which do not serve alcohol.

The conclusion that moral objections are not sufficient to bar otherwise protected activities is confirmed by *Erznoznik* v. *City of Jacksonville, supra,* 422 U.S. 205, in which the Supreme Court explicitly considered the weight of moral objections in a context similar to the present case. There, it rejected the argument that a statute barring drive-in theaters from showing movies "in which the human male or female buttocks, human female bare breasts, or human bare pubic areas are shown . . . ." (*Id.,* at p. 207 [45 L.Ed.2d at p. 129]) was justified by the city's interest in protecting its citizens from "unwilling exposure to materials that may be offensive" (*id.,* at p. 208 [45 L.Ed.2d at p. 130]) and in protecting the morals of children, who were allegedly watching these outdoor performances. As to the first rationale, the court noted that while "[m]uch that we encounter offends our esthetic, if not our political and moral, sensibilities," (*id.,* at p. 210 [45 L.Ed.2d at p. 131]) "when the government, acting as censor, undertakes selectively to shield the public from some kinds of speech on the ground that they are more offensive than others, the First Amendment strictly limits its power." (*Id.,* at p. 209 [45 L.Ed.2d at p. 131]; see also, *Salem Inn, Inc.* v. *Frank, supra,* 522 F.2d at p. 1049.) As to the city's other rationale, the protection of children, the court notes, "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." (*Erznoznik, supra,* 422 U.S. at pp. 213-214 [45 L.Ed.2d at p. 133].) The weight given to the county's moral objections in this case can certainly be no greater than in *Erznoznik,* since in the present case there is no allegation that children or unwilling victims have been subjected to nude dancing.

Equally unpersuasive is the contention that ordinance No. B13-14 is justified as a means of protecting the health of Santa Clara's citizens. The county argues that "if those persons who are employed to prepare, serve or handle food and beverages, or to entertain where food and beverages are prepared and served, do so in the nude, the increase in the risk of danger to the health of the consumers of such items would greatly increase." In support of this contention, the county cites Health and Safety Code section 28686, which, among other things, regulates the dress and cleanliness of those serving food and beverages. If the ordinance applied only to those serving food and beverages, this argument could be persuasive—especially because no sensible argument would support the proposition that the mere serving and handling of food is a form of protected expression. However, the very existence of Health and Safety Code section 28686 indicates that the county's concern with health considerations has been taken care of; we

cannot understand how nude or topless dancing, in itself, poses a health risk to its viewers. In short, if ordinance No. B13-14 is intended to protect the health of Santa Clara's citizens, it is vastly overbroad.[16]

We conclude with a few brief observations about the specific moral concerns expressed in the dissent.

■ On the subject that what is involved here is not the freedom of expression of the performer, but her employer's exploitation of that performance for profit, we can only point to *Joseph Burstyn, Inc.* v. *Wilson* (1952) 343 U.S. 495, 501-502 [96 L.Ed.2d 1098, 1106, 72 S.Ct. 777], which established once and for all that it is immaterial whether an activity which enjoys First Amendment protection is carried on for profit.

As far as the extensive quote from Professor Clor's article is concerned (Clor, *Public Morality and Free Expression: The Judicial Search for Principles of Reconciliation* (1977) 28 Hastings L.J. 1305), we merely observe that the cited passage forms part of an argument for the type of control of near-obscenity that was given a constitutional green light in *Young* v. *American Mini Theatres, supra,* 427 U.S. 50, 71 [49 L.Ed.2d 310, 326-327]. Needless to say, if local authorities wish to regulate otherwise protectible entertainment through the medium of *Young* type zoning, they should not feel discouraged by anything they read in this opinion.

Finally, on the issue of the degrading effect of exploiting female nudity for profit, what can we say that is *legally* relevant?[17] Would the argument have affected the model who posed for the Venus de Milo? Is it applicable to the management of the Louvre? If not, what legal—as distinguished from artistic—reason is there for zeroing in on Ms. Morris and the Hiphugger? The female body has been the inspiration of artists from time immemorial. Their motivations have ranged from the highest and purest to the vilest and most degrading. We need not detail the Supreme Court's heroic efforts to distinguish pornography from protectible expression. (E.g., *Miller* v. *California* (1973) 413 U.S. 15 [37 L.Ed.2d 419, 93 S.Ct. 2607].) Surely it cannot be contended that the law—as distinguished from other societal controls, such as family, church, peer groups, media,

---

[16]The county has also suggested that the ordinance is designed to prevent breaches of the peace. However, no evidence linking nude or topless dancing with breaches of the peace has been offered. Even if a link were established, the goal of preserving the peace would be equally served by narrower ordinances addressed to those who actually commit breaches of the peace.

[17]Of course, this argument has not been raised by the county. The reason is obvious: since the ordinance affects performers of both sexes, any avowed purpose to protect women would make it overinclusive. At the same time we suggest that the increasing prevalence of male "strip joints" makes the dissent's point underinclusive.

critics—should assume the role of the arbiter who segregates nudity which insults and degrades, from that which exalts the beauty of the human form, male and female.

Let a writ of prohibition issue as prayed.

**NEWMAN, J.**—I concur, though I would cite not the federal First Amendment but solely the California Constitution, article I, section 2, subdivision (a). Encroachments on "liberty of speech" protected by that section are authorized only when there has been an "abuse."[1]

The majority opinion might be read, I fear, to protect "nonobscene" entertainment only (see, e.g., *ante*, p. 563; cf. p. 564 ["obscene as to youths"]). The opinion reminds us (quoting *Erznoznik* v. *City of Jacksonville* (1975)] 422 U.S. [205] at p. 209 [45 L.Ed.2d 125, 130-131, 95 S.Ct. 2268]) of the United States Supreme Court's rejection of censorship that "undertakes selectively to shield the public from some kinds of speech on the ground that they are more offensive than others . . . " (*ante*, p. 567). But what about censorship of possibly "obscene" kinds of expression? Are they, by mere definition, sufficiently offensive to justify restraint? I think not; and in the 1980's it hardly seems fitting for our court in dicta to brand "obscene dancing" as an abuse of liberty of speech. (Cf. Manahan, *Is Sex Obscene?* 10 Human Rights No. 2 (1982) [inside cover page]: "The fact that many people find obscenity distasteful or even nauseating should not make the First Amendment inapplicable.")

If the majority here do immunize nonobscene dancing only, I submit that the commands of *In re Giannini* (1968) 69 Cal.2d 563 [72 Cal.Rptr. 655, 446 P.2d 535] (see maj. opn., *ante*, p. 564, fn. 11), regarding obscenity under California law, need re-emphasis. They are: (1) "expert testimony should be introduced to establish [contemporary] community standards" (p. 574); (2) "the relevant 'community' is the entire State of California" (p. 577); and (3) "the prosecution must [also] introduce evidence that, applying contemporary community standards, the questioned dance appealed to the prurient interest of the audience and affronted the standards of decency accepted in the community" (p. 567). Not only must those requirements be met but, in addition, the trial judge must be persuaded that the pertinent ordinance was "'narrowly drawn'" and furthers "'a sufficiently substantial governmental interest . . . '" (Maj. opn., *ante*, at

---

[1]"Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech . . . ."

p. 565, quoting *Schad* v. *Mount Ephraim* (1981)] [452 U.S. [61] at p. 68 (68 L.Ed.2d 671, 680, 101 S.Ct. 2176)].)

"[V]ague statutory language . . . creates the danger that police, prosecutors, judges and juries will lack sufficient standards to reach their decisions, thus opening the door to arbitrary or discriminatory enforcement of the law." (*Pryor* v. *Municipal Court* (1979) 25 Cal.3d 238, 252 [158 Cal.Rptr. 330, 599 P.2d 636]

**RICHARDSON, J.**—I respectfully dissent. The majority overrules our own decision in *Crownover* v. *Musick* (1973) 9 Cal.3d 405 [107 Cal.Rptr. 681, 509 P.2d 497], and, in doing so, bars the County of Santa Clara from enforcing its nude dancing ordinance. In my view, the majority seriously errs. Our *Crownover* analysis remains eminently sound and fully supports the constitutional validity of the county's ordinance.

The challenged ordinance, of course, is presumed to be constitutional. (*City of Industry* v. *Willey* (1970) 11 Cal.App.3d 658, 663 [89 Cal.Rptr. 922].) Moreover, it is solidly based upon two legitimate and substantial governmental interests: the traditional interest of local communities in promoting public morality and general welfare, and the emerging concern over the social harm caused by the sexual exploitation and degradation of women for profit. We should sustain the ordinance.

By its adoption of Penal Code sections 318.5 and 318.6, the Legislature has authorized municipalities to regulate nude or seminude entertainment. Section 318.5 permits the adoption of ordinances which directly regulate "the exposure of the genitals or buttocks of or the breasts of any person who acts as a waiter, waitress, or entertainer . . . " in places serving food or beverages for on-premises consumption. The section further recites that its provisions "shall not apply to a theater, concert hall, or similar establishment which is primarily devoted to theatrical performances." Section 318.6 permits adoption of similar ordinances "relat[ing] to any live acts, demonstrations, or exhibitions which occur in public places, places open to the public, or places open to public view . . . ." This section also contains a specific exemption for a "theater . . . primarily devoted to theatrical performances."

The county's nude dancing ordinance complies with the foregoing statutory provisions and no one contends otherwise. The sole question before us is whether that ordinance represents an unconstitutional restraint upon some form of protected expression.

Just nine years ago in *Crownover*, we upheld substantially identical ordinances against identical constitutional challenges which urged that nude dancing is a form of communicative activity protected by the First Amendment. In flatly rejecting the contention which the majority now accepts we held, alternatively, that (1) nude dancing ordinances regulate conduct, not speech, and such activity enjoys no First Amendment protection, and (2) even if some protected "communicative element" may exist, appropriate and legitimate governmental interests justify regulation or prohibition of nude dancing. (9 Cal.3d at pp. 425-428.)

Justice Sullivan, in writing for our court in *Crownover*, made the following cogent observations which retain their essential validity today: "It is clear that these provisions of the ordinances are directed at conduct—topless and bottomless exposure—and not at speech or at conduct which is 'in essence' speech or 'closely akin to speech.' A common sense construction [citation] of the pertinent provisions is that they proscribe nudity in specified public places. They do not prohibit entertainment but merely enjoin that if the entertainer or performer offers it, he or she must have some clothes on. In a word the ordinances regulate conduct. [¶] Is such conduct symbolic in the constitutional sense? Is this nudity in bars and other specified places open to the public so inherently communicative by nature as to call for the protection given the 'interchange of ideas . . . . [¶] [a]ll ideas having even the slightest redeeming social importance' [citation]? The questions seem to provide their own negative answers. Unless we wish to blind ourselves to what is happening in big cities with their 'topless' and 'bottomless' bars and 'nude live acts' in a tawdry atmosphere that blights the neighborhood if not the entire community, it is common knowledge that such conduct is nothing more than a sales gimmick. It is delusive to speculate in the face of these realities that the entertainment in this milieu will acquire protectible communicative properties by exposure of the genitals, pubic area or female breasts of the performers. *Assuming* arguendo that there may ensue in instances an expression which is communicative in the constitutional sense, we do not think it is unreasonable to regulate the *form* or *manner* of the communication." (Pp. 425-426, italics in original.)

Having initially concluded that nude dancing ordinances regulate conduct rather than speech, we nevertheless assumed in *Crownover*, for the purpose of argument, that in some instances a "communicative element" might exist which would invoke the four-fold test of *United States* v. *O'Brien* (1968) 391 U.S. 367, 376-377 [20 L.Ed.2d 672, 679-680, 88 S.Ct. 1673], to determine whether such conduct is constitutionally protected activity. We then applied the *O'Brien* test to such ordinances:

"*First*, it cannot be doubted that the governmental entities in the instant cases have the inherent constitutional power to regulate nude conduct in bars, restaurants and other public places. It is clear that such regulations are justified by considerations of public morals and general welfare [citations] to mention two, and the very elasticity of the police power gives it the capacity to meet the reasonable current requirements of a changing world. [Citation.]

"*Second*, it cannot be gainsaid that the regulations further 'an important or substantial governmental interest' (*United States* v. *O'Brien, supra,* 391 U.S. 367, 377 [20 L.Ed.2d 672, 680]) in promoting public morals. It is our province to take note of public morality, not to dictate it. In this pluralistic society we cannot say that a 'topless' female or a 'bottomless' or nude person of either sex in a public place or place open to the public is 'socially commonplace' [citation] or has the support of a 'societal consensus' [citation]. Indeed, the instant legislation conceivably gives some indication that such nude conduct is not in accord with the *mores* of the people as a whole.

"*Third*, it is also clear that this governmental interest in regulating nude conduct is 'unrelated to the suppression of free expression . . . .' (*United States* v. *O'Brien, supra,* 391 U.S. 367, 377.) The regulation is aimed at conduct, not speech; at 'separately identifiable conduct' [citation], not at an activity 'entirely divorced from actually or potentially disruptive conduct . . . .' [Citation.]

"*Fourth*, if the ordinances impose any incidental restriction on First Amendment freedom of speech and expression (and we doubt that they do) it is certainly 'no greater than is essential to the furtherance of [an important or substantial governmental] interest.' (*United States* v. *O'Brien, supra,* 391 U.S. 367, 377.) The ordinances do not *prohibit* speech or expression or entertainment; they merely direct that the entertainer cannot appear with genitals or breasts exposed. The ordinances proscribe no more than is necessary to ban the nudity which has been deemed harmful to public welfare or morals.

"We are satisfied therefore that, upon the *assumption* made of some communicative element in the conduct here under discussion, the ordinances before us meet all of the four requirements set down by the Supreme Court in the *O'Brien* case.

"We, therefore, conclude that the ordinances on their face do not infringe upon the rights of freedom of speech or expression but are valid regulations of conduct. In light of this conclusion we reject plaintiffs'

contention that the ordinances are unconstitutionally broad." (9 Cal.3d, at pp. 427-428, italics in original, fns. omitted.)

There is some significance in the fact that the United States Supreme Court, the final arbiter of First Amendment values in this nation, denied certiorari in *Crownover* (415 U.S. 931 [39 L.Ed.2d 489, 94 S.Ct. 1443]).

To justify its retreat from our *Crownover* principles, the present majority depends principally upon a few decisions from lower federal courts and upon inconclusive dicta from wholly inapposite decisions of the high court. From these barren sources, my colleagues conclude that regulation of nude dancing "impinge[s] upon protected speech" (*ante*, p. 563) and that such regulation may be sustained only if it is "'narrowly drawn' and furthers 'a sufficiently substantial governmental interest'" (*id.*, at p. 565). Relying on these cases, the majority labors to extract a principle that "the promotion of public morals" is an insufficient state interest to justify such regulation (*id.*, at p. 566). These conclusions are wholly unsupported by any post-*Crownover* decisions of the high tribunal which I now briefly review.

In *Erznoznik* v. *City of Jacksonville* (1975) 422 U.S. 205 [45 L.Ed.2d 125, 95 S.Ct. 2268], the court struck down an ordinance which prohibited the exhibition at drive-in movie theaters of *all* films containing nudity. The court observed that the ordinance would have applied to films protected by the First Amendment. (Pp. 208-212 [415 L.Ed.2d pp. 130-133].) As I have previously noted, the ordinance before us is considerably less sweeping, for it specifically exempts any acts or exhibitions occurring in theaters, concert halls or similar establishments.

Similarly, in *Doran* v. *Salem Inn, Inc.* (1975) 422 U.S. 922 [45 L.Ed.2d 648, 95 S.Ct. 2561], the high court affirmed a preliminary injunction directed at a municipal ordinance which prohibited "topless" dancing in *"any public place."* (Italics added.) *Doran* is significant in two respects. First, in describing the nature of the constitutional implications of such dancing the high tribunal was cautious in its approach. The court said, in dictum, that such "barroom" nude dancing *"may* involve only *the barest minimum* of protected expression," and *"might* be entitled to First and Fourteenth Amendment protection *under some circumstances."* (P. 932 [45 L.Ed.2d p. 660], italics added.) Second, the *Doran* court stressed that the ordinance there under attack "'not only prohibits topless dancing in bars but also prohibits any female from appearing in "any public place" with uncovered breasts. There is no limit to the interpretation of the term "any public place." *It could include the theater, town hall, opera house*, as well as a public market place, street or any place of assembly, indoors or outdoors. Thus, this ordinance would prohibit the

performance of the "Ballet Africains" and a number of other works of unquestionable artistic and socially redeeming significance.'" (P. 933 [45 L.Ed.2d p. 660], quoting with approval the lower court opn. in *Doran*, italics added.) Without reaching the "ultimate merits" of the constitutional question, the high court determined that the trial court did not abuse its discretion in issuing the preliminary injunction. (P. 934 [45 L.Ed.2d p. 661].)

*Doran* is thus wholly inapposite, involving as it does a total ban on "topless" dancing regardless of either the location or the theatrical nature of the performance. In contrast, the municipal regulation of nude dancing before us, exactly as in *Crownover*, again specifically does *not* extend to "a theater, concert hall, or similar establishment which is primarily devoted to theatrical performances." (Pen. Code, §§ 318.5, 318.6.) Moreover, while suggesting that nude dancing might represent the "barest minimum" of protected expression "under some circumstances," the high court expressly declined to explore that issue. *Doran*, accordingly, does not require any reconsideration of *Crownover*'s initial assumption that regulation of dancing without clothes restrains conduct, not speech.

Nor is *Schad* v. *Mount Ephraim* (1981) 452 U.S. 61 [68 L.Ed.2d 671, 101 S.Ct. 2176], in point. In *Schad*, the court struck down a purported "zoning" measure which would have excluded *all* commercial live entertainment in borough limits, including nude dancing. The court observed that Mount Ephraim had failed to justify adequately "its substantial restriction of protected activity." (P. 72 [68 L.Ed.2d p. 682], fn. omitted.) Rather than decide the precise extent to which nude dancing might share such protection, the court merely stated that "*Whatever First Amendment protection should be extended to nude dancing*, live or on film, however, the Mount Ephraim ordinance prohibits *all* live entertainment in the borough: no property . . . may be principally used for the commercial production of plays, concerts, musicals, dance or any other form of live entertainment." (P. 66 [68 L.Ed.2d p. 679], fn. omitted, italics added.)

Thus, *Schad*, considering as it did a sweeping restriction on *all* live entertainment, wholly fails to support the present majority's contention that prohibition of nude *nontheatrical* dancing impinges upon some protected activity. In view of the unduly broad scope of the zoning ordinance at issue in *Schad*, the high tribunal had no need to, and did not, reach that issue. It bears repeating that we are not here presented with an attempted censorship of any theatrical performance.

Finally, *New York State Liquor Authority* v. *Bellanca* (1981) 452 U.S. 714 [69 L.Ed.2d 357, 101 S.Ct. 2599], likewise affords no support whatever for the majority position. Rather, *Bellanca* only reinforces the

conclusion that the validity of the *Crownover* principles remain fully intact. In *Bellanca*, the high court *upheld* a state statute prohibiting nude dancing in bars. Once again, the Supreme Court declined to determine to what extend nude dancing partakes of any First Amendment protection, relying instead upon a state's overriding express grant of authority to regulate the sale and consumption of alcoholic beverages. In the court's words, "Whatever artistic or communicative value may attach to topless dancing is overcome by the State's exercise of its broad powers arising under the Twenty-first Amendment." (P. 718 [69 L.Ed.2d p. 361].)

We need not speculate on how the draftsmen of the First Amendment would have responded if, in 1789, they had been asked the question whether by banning nude dancing in a bar a county board of supervisors was thereby "abridging the freedom of speech" as the Founding Fathers understood the constitutional phrase. The important point is that the Supreme Court has never so held. This is fully confirmed by Justice Stevens in his dissenting opinion in *Bellanca*: "Although the Court has written several opinions implying that nude or partially nude dancing is a form of expressive activity protected by the First Amendment, *the Court has never directly confronted the question*." (Pp. 718-719 [69 L.Ed.2d p. 362], fn. omitted, italics added.) The justice then adds this interesting observation: "I must confess that if the question whether a State may prohibit nude or partially nude dancing in commercial establishments were squarely confronted on its merits, *I might well conclude that this is the sort of question that may be resolved by the elected representatives of a community*." (Pp. 722-723 [69 L.Ed.2d p. 364], italics added.) Precisely.

Notwithstanding all of the foregoing, the present majority draws from *Erznoznik*, *Doran*, *Schad* and *Bellanca* a sweeping and wholly unwarranted conclusion that a ban on nude dancing impinges upon protected speech. Not so, for in Justice Stevens' words in *Bellanca*, the high court "has never directly confronted the question." In this connection, and with due deference to the Ninth Circuit, I neither ignore nor agree with the views expressed in *Chase* v. *Davelaar* (9th Cir. 1981) 645 F.2d 735. Within the context of the constitutional implications of nude dancing in a nontheatrical setting, until the Supreme Court itself speaks on the issue, I accept the interim evaluation of a member of that high tribunal, which, incidentally, was made *after Chase*, that the question remains unresolved. In the meantime, of course, as the majority properly notes, litigants may pursue their remedies where they will.

At this point, it is fair to ask *whose* freedom of speech does the majority seek to protect? Is it that of the dancer whose message is not that of oral or

written speech or song or dance or expression, all of which are permitted, but who is only restrained from the removal of all clothing? Or is it the freedom of the dancer's employer, the bar owner, who, for profit, exploits such "speech" to sell alcoholic beverages? Or is it that of the bar patron, who "gets the message" by receiving the communication? Whoever's freedom it is and whatever its nature, if any, the high tribunal has never indicated that it would prevail over those public interests which were identified by us in *Crownover*. (9 Cal.3d *supra,* at p. 427.)

The ordinance being presumed constitutional, no United States Supreme Court decision being contrary, our inquiry then, as I conceive it, is to ascertain whether valid and legitimate grounds exist upon which the supervisors of Santa Clara County could justify the adoption of the ordinance.

It has recently been observed, on the related subject of control of obscenity, that "there can be little doubt that one of the major elements contributing to or detracting from the sense of community is the moral and aesthetic atmosphere which prevails in public places. . . . It can be argued that the crucial problem of contemporary America is more a declining sense of community than a decreasing amount of free speech." (Clor, *Public Morality and Free Expression: The Judicial Search for Principles of Reconciliation* (1977) 28 Hastings L.J. 1305, 1311-1312.) Nude dancing as commercial entertainment is the subject of appropriate local community concern affecting the "moral and aesthetic atmosphere" in the manner so vividly described by Justice Sullivan in *Crownover* (9 Cal.3d at p. 426). Such a community concern, as affecting a food and beverage establishment, has been reflected in the adoption by the people's representatives of Penal Code sections 318.5 and 318.6. This concern identified by the Legislature is not limited to the health and environmental factors associated with bars or restaurants. The public concern is fully equivalent to and meets the "significant state interest" which is demanded by the majority. My colleagues regrettably engage in a studied retreat from the well established principle that a local community, in the exercise of its police powers, may fully consider "the interest of the public in the quality of life and the total community environment." (*Paris Adult Theatre I* v. *Slaton* (1973) 413 U.S. 49, 58 [37 L.Ed.2d 446, 457, 93 S.Ct. 2628]; see *Young* v. *American Mini Theaters* (1976) 427 U.S. 50, 71 [49 L.Ed.2d 310, 326-327, 96 S.Ct. 2440].) Former Chief Justice Earl Warren stressed the same point when he said that the law fully recognizes "the right of the Nation and of the States to maintain a decent society . . . ." (*Jacobellis* v. *Ohio* (1964) 378 U.S. 184, 199 [12 L.Ed.2d 793, 804, 84 S.Ct. 1676] (dis. opn.).) In furtherance of this legitimate end, the representatives of the

sovereign people, in the exercise of their police power, surely may consider the maintenance of a community moral tone as well as the exploitation of its commercial opportunities.

There is a missing element in this dialogue, and that is a recognition that there are *degrees* of constitutionally protected communication. Speech, whether written, verbal, or demonstrative, is entitled to First Amendment protection. The Supreme Court has not recognized nude dancing in places serving food or beverages for on-premises consumption, as protected "speech." However, even if the high tribunal had so held it does not follow that such "speech" is thereby immunized from the exercise of a county's regulatory police power. Within a related context, Justice Stephens recently emphasized this principle in the following graphic manner: "Moreover even though we recognize that the First Amendment will not tolerate the total suppression of erotic materials that have some arguably artistic value, it is manifest that society's interest in protecting this type of expression is of a wholly different, and lesser, magnitude than the interest in untrammeled political debate that inspired Voltaire's immortal comment ['I disapprove of what you say, but I will defend to the death your right to say it']." (*Young* v. *American Mini Theatres, supra,* 427 U.S. 50, 70-71 [49 L.Ed.2d 310, 326].) If a dancer has any First Amendment right to remove all of her clothes, that right is one of "lesser magnitude" than that required to defeat a local community's exercise of its police power in the protection of legitimate and recognized social values.

There is another compelling societal interest fully supportive of the regulation before us. This is the belated but growing awareness of social harm resulting from the sexual exploitation and degradation of women for profit. (See Bryant, *Sexual Display of Women's Bodies—A Violation of Privacy* (1980) 10 Golden Gate L.Rev. 1211, 1227-1228; Brownmiller, Against Our Will, Men, Women and Rape (1973) pp. 390-396; see generally Dworkin, Pornography: Men Possessing Women (1981); Griffin, Pornography and Silence: Culture's Revenge Against Nature (1981); *Taking action,* in Take Back the Night: Women on Pornography (Lederer edit. 1980) § VI, at pp. 259-291.)

As a recent commentator observed, "As long as the sexes are divided by unequal status, and women as a class are defined first and primarily by our sexuality, the sexual commercialization of female nudity will be an insult to the dignity and liberty of all women." (10 Golden Gate L.Rev., pp. 1227-1228.) The student author thoughtfully argues that "The commercialization and exposure of our most private sexual characteristics for

the gratification of the opposite sex, is a grievous example of an assault on liberty and privacy, and insult to a class of people." (Id., p. 1234.)

As we noted in *Crownover*, nude dancing within this context is a pure commercial "sales gimmick." If substantial numbers of the citizenry, additionally, find the conduct cheapening, demeaning and degrading to women the Santa Clara County Board of Supervisors, in my view, surely may consider these factors when, as a policy matter, it weighs considerations of public morality and the general welfare against some ethereal constitutional right to dance naked.

Other writers have suggested that there is a public safety factor that is inherent in this area; that the pornographic exposure or display of women's bodies may, additionally, enhance the risks of rape, sexual assaults, and other sexual harrassment. (Brownmiller, *supra,* at pp. 390-396; *Research on the Effects of Pornography,* in Take Back the Night: Women on Pornography, *supra,* § IV, pp. 185-238.) I do not know whether there is any statistical correlation between nude dancing and criminal assaultive sexual behavior. I think it is possible, but perhaps there is none. In any event, the board of supervisors could reasonably have considered this possibility, among several others, in adopting the ordinance in question.

I find singularly unpersuasive the majority's invocation of the constitutionality of the display of the Venus de Milo. The ordinance in question is directed at waiters and entertainers in establishments "which serve food or beverages." Its target is live entertainment in bars, saloons and restaurants, not sculptures in museums. The Louvre in Paris and the Hiphugger in San Jose are separated by more than geography.

Given the various legitimate and compelling objections to the commercial exposure of the intimate parts of women's bodies, it is clear that the state and its local subdivisions have substantial and demonstrable interests in regulating the commercial exploitation of female nudity in a nontheatrical setting. It is legally and constitutionally appropriate for local communities to conclude that the factors of morality, the general welfare, the sensitivies of women, and public health and safety outweigh the "free speech" right of dancers to remove their clothes, if any such constitutional right exists.

In short, contrary to the majority, there has been no change in "later decisions" of the Supreme Court. Several legitimate and recognized public concerns amply support and justify the county ordinance which my

colleagues unfortunately invalidate. Our *Crownover* rationale remains as valid today as it was in 1973.

I would deny the writ.

Reynoso, J., concurred.