[No. B019051. Second Dist., Div. One. July 28, 1987.]

H-CHH ASSOCIATES et al., Plaintiffs and Appellants, v.
CITIZENS FOR REPRESENTATIVE GOVERNMENT et al.,
Defendants and Appellants.

COUNSEL

Ball, Hunt, Hart Brown & Baerwitz, Pepper, Hamilton & Scheetz, Thomas J. Leanse, Scott D. Pinsky, Agnes H. Mulhearn, Cheryl L. Wright, Charles M. Gale and Gregory A. Bray for Plaintiffs and Appellants.

Gronemeier, Barker & Huerta, Dale L. Gronemeier, Nicholas George Rodriguez, Brenda J. Penny, Christopher A. Sutton and Elbie J. Hickambottom for Defendants and Appellants.

Allen B. Grodsky, Robert B. Broadbelt, Antonette B. Codero, Gary Williams and Paul Hoffman as Amici Curiae.

## OPINION

**SPENCER, P. J.—**

### INTRODUCTION

Defendants Citizens for Representative Government and individual members thereof appeal from orders granting a temporary restraining order and a preliminary injunction to plaintiffs H-CHH Associates and Hahn Property Management Corporation. Plaintiffs appeal from that portion of the order which invalidates their rules and regulations proscribing the solicitation of funds from or approaching plaintiffs' patrons.

### STATEMENT OF FACTS

Plaintiffs own and operate privately an extensive shopping center in downtown Pasadena known as Plaza Pasadena. The two-story building complex contains approximately 600,000 square feet of rental space and caters to 125 commercial tenants. This area surrounds a central courtyard running the length of the mall interior. The area denominated "Garfield Court" is approximately 100 feet wide; the remainder of the courtyard is approximately 40 feet in width. The Plaza occupies several square blocks along the city's major thoroughfare and has replaced, for the most part, one of the city's major shopping districts. It is immediately adjacent to the Pasadena auditorium and convention center and within one block of city hall. The city's redevelopment agency financed three underground parking garages extensively used by the Plaza and for which the Plaza pays rental fees. There is little access to the Plaza from public streets and the vast majority of Plaza patrons gain entrance through the city-owned parking garages. The land upon which the Plaza stands is city-owned, acquired through the exercise of its powers of condemnation.

On December 19, 1985, defendant Dale L. Gronemeier (Gronemeier), a member and representative of Citizens for Representative Government, approached Patricia K. Maude (Maude), the manager of Plaza Pasadena, expressing a desire to circulate leaflets and gather petition signatures on Plaza property. Maude supplied Gronemeier with a registration form developed by plaintiffs and a set of plaintiffs' written "Rules of Political Petitioning on Shopping Center Property." She also advised him that Plaza Pasadena would not permit the solicitation of signatures during the Christmas season. Gronemeier nevertheless informed Maude that Citizens for Representative Government would appear to solicit signatures on Monday evening, December 23, 1985.

The preamble to plaintiffs' written rules defines "political petitioning" as "any conduct by which an individual obtains signatures for any petition directed to any governmental or political body. These rules shall not be deemed or construed to permit any activity other than political petitioning, and the owners of the center reserve the right to prohibit any activity other than that described in these Rules and sanctioned by law."

Rule 1 of plaintiff's written rules provides in pertinent part: "Prior to engaging in political petitioning, a petitioner must notify the center management office and provide it with the name, address, signature of a responsible adult who, by said signature, expressly accepts full liability for damage, costs or expenses resulting from the proposed activity. Said liability shall include, but is not limited to, maintenance costs for cleaning up litter and expenses resulting from damage to persons or property or both." Rule 2 states: "If leaflets or other material are to be handed out . . . , the petitioner must post a $50.00 security deposit to cover the cost of cleaning up litter which results from such activity. The deposit, less any expense incurred . . . , shall be refunded approximately two weeks after said activity has ended."

Rule 3 requires that "All petitioners engaged in political petitioning shall use only that portion of the center property expressly designated for that purpose by the center management office." Rule 4 leaves the number of petitioners who may engage in political petitioning at a given time solely within the discretion of the management office. "This determination shall be based on the following factors: (1) the area available for such activities; (2) the number of petitioners who wish to engage in such activities at one particular time; (3) the potential for conflict between petitioners or between petitioners and members of the public; and (4) the safety of the public and center property." Similarly, rule 5 leaves the time during which political petitioning may take place solely within the discretion of the management office and states that determination is to be based on the four factors enumerated in rule 4.

Rule 6 provides: "Only that furniture . . . approved by the center management office shall be used on the center property for political petitioning. Said furniture shall be located as prescribed by the center management office." Rule 7 states: "Posters, plaquards [*sic*] and displays as well as their location and method of display shall be subject to the approval of the center management office. In no event shall such materials be affixed to any portion of the center property." Rule 9 prohibits the use of lights, loudspeakers or other electrical or mechanical equipment, while rule 10 prohibits the use or operation of any musical instrument or sound reproduction device "in

such a manner as to cause any sound or noise which, in the reasonable belief of the center management office, may be disturbing or offensive."

Rule 8 prohibits petitioners from making an "express or implied representation to any person within the center or on center property that the owner or the manager of the center sponsors or supports any view, belief, or request contained in any petition, statement or literature being disseminated or exhibited on center property." Rule 11 prohibits the solicitation of "contributions or donations from anyone on center property," as well as "the sale of any items or services on said property." Rule 12 requires that petitioners "not impede or interfere with the business of any center tenants, employees or personnel, nor shall they approach, detain, or in any way impede or interfere with the smooth flow and free passage of center patrons, customers or personnel through the access ways of the center."

Rule 13 provides: "If in the good faith judgment of the center management office the measure of the proposed political petitioning activity creates a risk of injury or damage to person or property, and that such a risk warrants special insurance protection, then the petitioner planning to engage in such activity must purchase and carry the necessary insurance coverage. Said insurance policy shall name as additional insureds Hahn Property Management Corporation, the center owner and the center Merchants' Association and petitioner shall provide the center manager prior to commencement of political petitioning with a valid certificate of insurance evidencing the same." Finally, rule 14 promulgates standards of general decorum.

In addition to the written rules, plaintiffs have adopted the following unwritten rules which govern political activity on Plaza Pasadena property. A party seeking the use of Plaza property for political activity must fill out the written registration form; thereafter, he or she will receive notification within 72 hours of acceptance or rejection of the application. Apart from verifying that the activity involved is political rather than commercial, the management office is to have no concern with the subject matter of the activity. Generally, political activities are to be assigned to the Garfield Court area. No political activities will be authorized the day after Thanksgiving or during the latter part of December. The availability of the forum for the days requested must be confirmed; each applicant will be limited to two days unless no other request has been made for the third day and day-to-day thereafter. Political activities are to be manned by a maximum of two persons, and the Plaza will provide authorized display furniture only: a card table with tablecloth and two chairs. The only articulated standard for denying an application is a determination that it will "adversely affect the shopping center environment, atmosphere, or image."

. After consulting with Susan Roberts, director of marketing for Plaza Pasadena, Maude made a decision in the first week of December to prohibit political activity during the Christmas season. At that time, the Plaza accomodated a large Christmas tree, a Santa Claus display, an automobile raffle, a gingerbread house display and auction, booths for gift wrapping, mailing and gift certificates, a toy collection facility and various story book displays. In addition, Plaza traffic increased significantly at that time of the year, as evidenced by the increase in use of the parking structure during December 1984 from 214,051 automobiles to 344,500. Statistically, pedestrian traffic appears to increase approximately 70 percent during this period, with each visitor staying longer. However, direct observation at 6 p.m. on Friday, December 20, 1985, found traffic in the Plaza to be extremely light.

## PROCEDURAL BACKGROUND

On December 23, 1985, plaintiffs sought injunctive and declaratory relief which would require that defendants comply in full with the Plaza's rules and regulations, written and unwritten, regarding political activity. They applied ex parte for a temporary restraining order, prior to a hearing on the propriety of a preliminary injunction, on the ground defendants had stated the intention of distributing leaflets and seeking signatures for political petitions in total disregard of the applicable rules and regulations. Defendants cross-complained, seeking to enjoin plaintiffs from enforcing those rules. The trial court immediately issued plaintiffs a temporary restraining order on the terms requested and set the matter of a preliminary injunction for hearing on January 10, 1986.

Thereafter, Citizens for Responsible Government applied to the Plaza Pasadena management for permission to collect signatures on political petitions on January 2, 1986; permission was granted only on condition defendants comply with all rules and regulations. After taking evidence, the court granted plaintiffs a preliminary injunction, finding all rules and regulations to be reasonable and valid as written, with the following exceptions: The definition of "political petitioning" must be expanded to include the distribution of written materials and the solicitation of funds; rule 7 must be limited in application to approval of the size, number and location of posters, placards and displays; rule 11 may not be applied to prevent the solicitation of contributions to support defendants' political advocacies; and rule 12 may not be utilized to prohibit the "approach" of Plaza patrons within a reasonable radius of the area designated for petitioning. The court also found plaintiffs' registration form and the requirements therein to be reasonable.

Defendants and "their agents, servants, and all persons acting in concert with any or all" of them were restrained from "engaging in any political activity on the premises of Plaza Pasadena . . . until said defendants have caused to be submitted to plaintiff an application or registration and have received approval by plaintiff for such activity"; and from "violating or failing to comply with the rules and regulations adopted by plaintiffs" with the exceptions delineated above. The instant appeals followed.

## CONTENTIONS

### I

Defendants contend the trial court erred in granting a preliminary injunction, in that plaintiffs' rules and regulations fall outside the spectrum of reasonable time, place and manner restrictions and, hence, impermissibly restrict defendants' exercise of their First Amendment rights.

### II

Defendants further contend the trial court erred in issuing a temporary restraining order, in that the invocation of the plaintiffs' rules and regulations impermissibly restricted defendants' exercise of their First Amendment rights.

### III

Plaintiffs assert the trial court erred in invalidating rules 11 and 12 insofar as they proscribe the solicitation of political funds or political petitioners' approach of Plaza patrons.

## DISCUSSION

### I

Defendants contend the trial court erred in granting a preliminary injunction, in that plaintiffs' rules and regulations fall outside the spectrum of reasonable time, place and manner restrictions and, hence, impermissibly

restrict defendants' exercise of their First Amendment rights. We agree to a significant extent.

Section 2 of article I of the California Constitution guarantees to the citizens of this state the rights of free speech and a free press. Our Supreme Court first addressed the applicability of these rights, if any, to privately owned shopping centers in *Diamond* v. *Bland* (1970) 3 Cal.3d 653 [91 Cal.Rptr. 501, 477 P.2d 733] (*Diamond I*). In *Diamond I*, the court considered the nature and character of a privately owned shopping center—a place which the public is openly and expressly invited to use at its pleasure—and concluded citizens had the right to exercise rights of free speech and petitioning in that forum, notwithstanding its privately owned character. The court emphasized the minimal impact on a shopping center owner's private property rights from permitting a small, orderly group to utilize that property as a forum. (At p. 665.)

Two years later, In *Lloyd Corp.* v. *Tanner* (1972) 407 U.S. 551 [33 L.Ed.2d 131, 92 S.Ct. 2219], the United States Supreme Court held the invitation to public use of a shopping center was not a sufficient dedication of privately owned property to public use to entitle citizens to utilize it as a forum for the exercise of First Amendment rights. (At p. 570 [33 L.Ed.2d at p. 143].) Accordingly, a privately owned center could prohibit the distribution of printed material unless that material communicated information relating to the center's business—*provided* there existed adequate alternate means of communication. (*Ibid.*) Prompted by the decision in *Lloyd Corp.*, our Supreme Court reconsidered the issue in *Diamond* v. *Bland* (1974) 11 Cal.3d 331 [113 Cal.Rptr. 468, 521 P.2d 460] (*Diamond II*) and concluded *Lloyd Corp.* required that *Diamond I* be overruled.

The matter next came before our Supreme Court in *Robins* v. *Pruneyard Shopping Center* (1979) 23 Cal.3d 899 [153 Cal.Rptr. 854, 592 P.2d 341]. The court notes the express provision in the California Constitution guaranteeing "the right to . . . petition government for redress of grievances" (art. I, § 3), and explicates the importance of that right as "an essential attribute of governing." (23 Cal.3d at p. 907.) *Robins* continues, "the [state's] power to regulate property is not static; rather it is capable of expansion to meet new conditions of modern life. Property rights must be ' "redefined in response to a swelling demand that ownership be responsible and responsive to the needs of the social whole. Property rights cannot be used as a shibboleth to cloak conduct which adversely affects the health, the safety, the morals, or the welfare of others." ' " (At pp. 906-907, quoting from *Agricultural Labor Relations Bd.* v. *Superior Court* (1976) 16 Cal.3d 392, 404 [128 Cal.Rptr. 183, 546 P.2d 687].)

*Robins* analyzes in detail the burgeoning importance of the shopping center in society and in community development, concluding: "To protect free speech and petitioning is a goal that surely matches the protecting of health and safety, the environment, aesthetics, property values and other societal goals that have been held to justify reasonable restrictions on private property rights." (23 Cal.3d at p. 908.) The court then turns its attention to the scope of protection which the California Constitution affords the rights of free speech and press, finding that section 2 of article I provides " 'more definitive and inclusive' " guarantees than does the First Amendment to the federal Constitution. (*Ibid.,* quoting from *Wilson* v. *Superior Court* (1975) 13 Cal.3d 652, 658 [119 Cal.Rptr. 468, 532 P.2d 116].) Given the scope of that protection, the court holds, "the public interest in peaceful speech outweighs the desire of property owners for control over their property." (*Robins, supra,* at p. 909; see also *Schwartz-Torrance Investment Corp.* v. *Bakery & Confectionery Workers' Union* (1964) 61 Cal.2d 766, 768 [40 Cal.Rptr. 233, 394 P.2d 921].)

In conclusion, *Robins* emphasizes: "By no means do we imply that those who wish to disseminate ideas have free rein. We noted above Chief Justice Traynor's endorsement [in *In re Hoffman* (1967) 67 Cal.2d 845 (64 Cal.Rptr. 97, 434 P.2d 353)] of time, place, and manner rules. (. . . at pp. 852-853.) Further, as Justice Mosk stated in *Diamond II,* 'It bears repeated emphasis that we do not have under consideration the property or privacy rights of an individual homeowner or the proprietor of a modest retail establishment. . . . A handful of additional orderly persons soliciting signatures and distributing handbills in connection therewith, under reasonable regulations adopted by [the property owner] to assure that these activities do not interfere with normal business operations (see *Diamond* [I] at p. 665) would not markedly dilute . . . property rights.' (11 Cal.3d at p. 345 (dis. opn. of Mosk, J.).)" (*Robins, supra,* at pp. 910-911.)

■ The exercise of rights of free expression may be restricted when it conflicts with the promotion of countervailing substantial or compelling interests. (*First National Bank of Boston* v. *Bellotti* (1978) 435 U.S. 765, 786 [55 L.Ed.2d 724, 98 S.Ct. 1407].) However, even those restrictions justified in the protection of these interests must be narrowly drawn to that end. (*Ibid.; Alternatives for California Women, Inc.* v. *County of Contra Costa* (1983) 145 Cal.App.3d 436, 449 [193 Cal.Rptr. 384].) To be reasonable, such regulations must be neither vague nor subjectively over- or underinclusive. (*Schad* v. *Mount Ephraim* (1981) 452 U.S. 61, 68-71 [68 L.Ed.2d 671, 679-682, 101 S.Ct. 2176]; *Morris* v. *Municipal Court* (1982) 32 Cal.3d 553, 565.)

In essence, *Robins* v. *Pruneyard Shopping Center, supra,* 23 Cal.3d 899, in affirming a shopping center owner's right to impose reasonable time, place and manner restrictions on petitioning activity, recognized in the owner important rights of substance; those rights are identified as freedom from disruption of normal business operations and freedom from interference with customer convenience. However, despite plaintiffs' characterization to the contrary, *Robins* did not establish a new standard of reasonableness to be applied to private property. *Robins* relied heavily on *Diamond I, supra,* 3 Cal.3d 653 and *In re Hoffman, supra,* 67 Cal.2d 845, each of which addressed the use of privately owned property as a "quasi-public" forum. *Hoffman* is particularly instructive on the issue of what type of restriction is reasonable. The court first specifies that protected activity which is free from interference: that which does not interfere with the conduct of business or the use of the property, does not impede the movement of customers or business tenants, does not block access to facilities or businesses, is not noisy and creates no disturbance and does not entail the harassment of uninterested patrons. (*Id.,* at p. 851.) Moreover, *Hoffman* notes: "It is immaterial that another forum, equally effective, may have been available . . . . Absent the presence of some conflicting interest that could be protected in no other way, petitioners have the right to choose their own forum." (*Id.,* at p. 852, fn. 7.)

To be certain protected activity falls within the above category, "[c]ongestion can be avoided by controls on activities during peak hours. [Citations.] *Reasonable* and *objective* limitations can be placed on the number of persons who can be present . . . at the same time, and the persons present can be required so to place themselves as to limit disruption. [Citation.] In areas normally subject to congestion, . . . [protected] activities can be prohibited. [Citations.] Persons can be excluded entirely from areas where their presence would threaten personal danger or block the flow of . . . traffic, such as doorways and loading areas. [Citations.]" (*Id.,* at pp. 852-853, italics added.) It is clear that *Hoffman* requires time, place and manner regulations to be narrowly focused in the traditional manner; so, too, does *Robins.*

Neither can the rights sanctioned in *Robins* be equated with commercial speech rights. ■ It is not the medium chosen, but the content of the message which distinguishes commercial speech from other expression; hence, regulation to the extent permitted for commercial speech is not appropriate simply because a commercial medium has been selected for the communication of noncommercial ideas. (*City of Indio* v. *Arroyo* (1983) 143 Cal.App.3d 151, 158 [191 Cal.Rptr. 565].) ■ In sum, like any other time, place and manner regulations, those of a shopping center are constitu-

tionally reasonable only if they are narrowly drawn and limited to the end of promoting specifically identified substantial interests.

■ The appropriateness of applying the traditional analysis of time, place and manner regulations to the instant matter is reinforced by the distinction between the Plaza and the privately owned "quasi-public" forums identified in *Hoffman, Diamond I* and *Robins*. In each of those cases, the facility and the land upon which it stood were wholly owned by private enterprises which acquired their "quasi-public" status solely from the manner in which the facilities were used. In contrast, the Plaza does *not* own the land upon which it stands or the three underground parking garages which accomodate its customers. The city exercised its powers of eminent domain to permit the development of the Plaza and financed construction of the parking facilities through its redevelopment agency; the Plaza pays rental fees for the use of the parking facilities.

The integrated nature of the publicly owned land and parking structures and the privately owned Plaza has been commented upon previously. (See *Graydon* v. *Pasadena Redevelopment Agency* (1980) 104 Cal.App.3d 631, 634-635 [164 Cal.Rptr. 56].) When a public entity so far insinuates itself into a position of interdependence with the private enterprise, the public entity becomes a joint participant in challenged activity. (*Burton* v. *Wilmington Pkg. Auth.* (1961) 365 U.S. 715, 725 [6 L.Ed.2d 45, 52, 81 S.Ct.856].) In these circumstances, it is clear the constitutionality of plaintiffs' regulations must be assessed by "a balancing of interests and a determination that [the party] has used the 'least restrictive means' to regulate the conduct in question." (*Spiritual Psychic Science Church* v. *City of Azusa* (1985) 39 Cal.3d 501, 517 [217 Cal.Rptr. 225, 703 P.2d 1119].)

■ Defendants challenge nearly every aspect of plaintiffs' regulatory scheme for political petitioning, beginning with the preamble to the written rules. They maintain that the definition of political petitioning as "any conduct by which an individual obtains signatures for any petition directed to any governmental or political body" discriminates against other expressive activity based on content. The trial court ruled the preamble must be read to include within its definition the solicitation of political contributions, but defendants argue petitioners still are barred from explaining their views to Plaza patrons, distributing explanatory literature or making visual presentations in support of their views. This interpretation of the definition is unduly narrow. By logical inference, any or all of the activities purportedly barred play a central role in obtaining political petition signatures. The *reason* for the petition and its supporting rationale provide the only sound basis for inducing a citizen to sign it. Logic dictates that the definition be

given this expansive interpretation; so interpreted, it is free from constitutional defect.

 Defendants also attack the application process, which is embodied in Rule 1 of the written rules, the registration form itself and an unwritten rule. This regulatory complex requires that an individual or organization wishing to utilize plaintiffs' property for political petitioning submit a written application. The following information must be provided: the name and address of the individual or group seeking to engage in expressive activity; the name and "identification" number of the person "in charge"; the "nature" of the political petition for which signatures are sought; the date and time applicants wish to engage in petitioning activity; whether written literature will be distributed; the number of persons who will participate and a telephone number for contact. In addition, the applicant must provide the name, address and telephone number of a "responsible person" who will expressly assume full liability for any "damage, costs or expenses." The sole criteria for determining whether an application will be denied is whether the planned activity will "adversely affect the shopping center environment, atmosphere or image."

In promoting their legitimate ends, plaintiffs have a clear and substantial interest in distinguishing between political and nonpolitical activity; hence, they may inquire in general terms about the "nature" of the petition at issue, i.e., is it directed to city hall, a department of city or county or state government, is it a proposed ballot measure? Similarly, given plaintiffs' substantial interest in avoiding the disruption of normal business and interference with patrons, they have the right within reasonable limits to plan the date, time, location and size of the petitioning activity and this requires communication. Communication, in turn, requires some means of contacting the individual or organization seeking to engage in expressive activity; a telephone number provides a reasonable means of communication.

More specific identification, such as an address and "identification" number, provides a reasonably limited means of determining the identity and location of the applicant in the event the Plaza finds it necessary to pursue a liability claim. Defendants rely on *Rosen* v. *Port of Portland* (9th Cir. 1981) 641 F.2d 1243, which states: "The requirement that those desiring to exercise free speech rights identify themselves and supply the names, addresses, and telephone numbers of sponsoring or responsible persons . . . has a 'chilling effect' on free speech." (At p. 1250; see also *Talley* v. *California* (1960) 362 U.S. 60, 64 [4 L.Ed.2d 559, 563, 80 S.Ct. 536].) Hence, any such requirement must not exceed the least drastic means which will achieve

plaintiffs' legitimate purpose. (*Shelton* v. *Tucker* (1960) 364 U.S. 479, 488 [5 L.Ed.2d 231, 237, 81 S.Ct. 247].)

In the instant matter, plaintiffs' substantial interests diverge from those of a purely public entity. The detailed information required in the registration form provides the least drastic means of assuring plaintiffs some protection from unduly burdensome nonincidental costs which may flow from petitioning activity; they need not assume the same degree of risk which a public entity may be asked to bear. However, the "guarantee" of liability by a "responsible person" required by rule 1 exceeds the "least restrictive means" standard. Clearly, if mere identification may have a "chilling effect" on free speech, the effect of a demand that a designated "responsible person" expressly assume "all liability" will be most profound. So long as plaintiffs possess the other information requested, they know all that is necessary to identify the party "responsible" and pursue any legal remedies.

Most importantly, the standard set forth in the unwritten rule governing whether an application will be accepted or rejected is fatally flawed. It confers broad, unbridled discretion on Plaza management, permitting rejection on a determination the planned activity will "adversely affect the shopping center environment, atmosphere or image." Any procedure regulating expressive activity which confers such unbounded discretion permits a decision to be based impermissibly on the content of expression. (*Dillon* v. *Municipal Court* (1971) 4 Cal.3d 860, 869-870 [94 Cal.Rptr. 777, 484 P.2d 945].) �switch To be valid, the regulation of expression must provide definite, objective written guidelines for the exercise of discretion. (*Ibid.*; accord, *Dulaney* v. *Municipal Court* (1974) 11 Cal.3d 77, 86 [112 Cal.Rptr. 777, 520 P.2d 1]; *Carreras* v. *City of Anaheim* (9th Cir. 1985) 768 F.2d 1039, 1049.) ▪ Since plaintiffs provide no definite, objective guidelines whatever as to how discretion is to be exercised in making the general, subjective determination an expressive activity will "adversely affect" the Plaza "environment, atmosphere or image," the standard necessarily is constitutionally defective.

In sum, much of plaintiffs' application procedure, encompassing the registration form, the unwritten rules mandating written application and conferring unbridled discretion to deny an application on the basis of general, subjective criteria only and rule 1 requiring a designated "responsible person's" acceptance of "all liability," is overbroad and therefore constitutionally invalid. (*Morris* v. *Municipal Court, supra,* 32 Cal.3d at p. 565.)

While there is a plethora of authority identifying the type of regulation which fails to pass constitutional muster, we note the dearth of authority

which provides any form of guidance as to the type of regulation which is valid. To the end of foreshortening the prospects of increased litigation on this issue, we will undertake to fill the void.

■ In replacement of the overbroad and subjective standard for accepting or rejecting applications for expressive activity, we suggest the type of objective written standard which would withstand constitutional scrutiny. In our view, the following criteria meet that test: (1) Whether the planned activity is to be presented in a noisy, disorderly or inflammatory manner as opposed to a neat, orderly and courteous manner; (2) whether the planned manner of presentation threatens to (a) interfere with the conduct of business or the customary uses of the property, either by its form, its size, its location or its timing (e.g., coinciding with peak business hours or days); (b) impede the movement of customers or tenants; or (c) block access to facilities and businesses; (3) whether the planned manner of presentation is confrontational to a degree that it is probable it will create a disturbance; and (4) whether the planned size or location of the activity threaten personal safety, in that it may block the flow of traffic or create a hazardous degree of congestion. Employing these criteria in concert with other standards we suggest *post,* avoids the vice of that unbridled discretion which lends itself to regulation on the basis of content.

■ Defendants next attack rule 2, which requires a $50 cleaning deposit if leaflets are to be distributed; the deposit is refundable to the extent costs are not incurred. A registration fee or deposit may be required where the permitting authority will likely incur additional cost from the exercise of expressive rights as long as it bears a reasonable relationship to the costs likely to be incurred. (*Cox* v. *New Hampshire* (1941) 312 U.S. 569, 577 [85 L.Ed.1049, 1054, 61 S.Ct. 762, 133 A.L.R. 1396].) In the instant matter, the amount of the deposit, $50, is little more than de minimis and does not appear excessive in light of the costs likely to be incurred in cleaning litter from a facility of this size. Hence, it is a reasonable regulation.

■ Rule 3 mandates that persons engaging in petitioning activity use only that portion of plaintiffs' property which management expressly designates for that purpose. An unwritten rule generally places such activity in Garfield Court, the larger courtyard area on the first floor of the Plaza. Defendants argue that Rule 3 is invalid, in that it contains no requirement that an area *be* designated; they misperceive the problem. Facially, rule 3 suffers from no defect, but it must be read in connection with the unwritten rule assigning petitioners to Garfield Court. That rule can be interpreted either as carrying the fair implication that no other area will be designated,

notwithstanding suitability or availability, or simply as indicating a preference for Garfield Court.

If the former interpretation is to apply, the rules, read together, are unreasonably restrictive for plaintiffs made no showing whatsoever that there is no location in their extensive common area, other than Garfield Court, which could accomodate expressive activity. A regulating authority may not adopt rules which preclude the exercise of free expression in an appropriate place, even on the ground another place is available. (*California Newspaper Publishers Assn., Inc.* v. *City of Burbank* (1975) 51 Cal.App.3d 50, 54 [123 Cal.Rptr. 880]; see also *Dillon* v. *Municipal Court, supra,* 4 Cal.3d 860, 869-870.) Under this interpretation, the rules do just that and therefore fail to pass constitutional muster.

If the latter interpretation governs, rule 3 remains defective. It confers on Plaza management unbounded discretion to choose the site of petitioning activity should Garfield Court be unavailable. Absent definite, objective written criteria for determining an alternative location or for refusing to provide any location, rule 3 therefore is invalid. (*Ibid.*)

Again, the formulation of objective criteria would cure the defects in rule 3 and its companion unwritten rule. First, it would be reasonable for plaintiffs to determine and to specify that problems of littering justify limiting any applicant who intends to distribute literature to the Garfield Court area. Second, plaintiffs possess information from which they can determine the maximum number of petitioning activities of a certain size which can be accomodated in Garfield Court at one time on a normal business day and during both peak and non-peak business hours. Once those maximums are specified, the foundation exists for objective determinations: (1) Whether the applicant intends to distribute literature and, if so, (2) whether there remains sufficient space in Garfield Court on the requested day and during the requested hours to accomodate this activity; (3) if there is no remaining available space, whether the applicant is willing to make adjustments in the day, hours or size of the presentation which will permit accomodation of the activity or to forego the distribution of literature.

This last inquiry is critical, for it is clear other areas of the courtyard can accomodate expressive activity which is small and avoids obstructing or interfering with the public or Plaza business operations. For instance, an applicant may be willing to limit petitioning to one or two persons equipped only with a clipboard holding the petition and pen to facilitate obtaining signatures who will agree to circulate politely and unobtrusively in areas outside of Garfield Court. Again, plaintiffs possess the means for objectively

determining the maximum amount of such petitioning traffic other court-yard areas reasonably can accomodate under normal business conditions.

Having established criteria for normal business conditions, plaintiffs also possess the information necessary to objectively determine the effect of special events, such as sales or special commercial displays. Such determinations should focus on the size and nature of the special event, i.e., whether a sale involves one or more anchor store or is mall-wide.

Rules 4 and 5 leave the number of petitioners who may engage in expressive activity at a given time and the time during which the activity may take place solely within the discretion of the Plaza management. The rules set forth guidelines governing the determination: "(1) the area available . . . (2) the number of petitioners who wish to engage in such activities at one particular time; (3) the potential for conflict between petitioners or between petitioners and members of the public; and (4) the safety of the public and center property." In addition, an unwritten rule limits the number of petitioners engaging in any one expressive activity to a maximum of two.

The "area available," "potential for conflict," and "safety of the public and . . . property" all involve general, subjective determinations. The latter two categories fall squarely within those criteria long recognized as vague, uncertain or overbroad. (See, e.g., *City of Indio* v. *Arroyo, supra,* 143 Cal.App.3d at pp. 160-161; *City of Imperial Beach* v. *Escott* (1981) 115 Cal.App.3d 134, 138-139 [171 Cal.Rptr. 197]; *Carreras* v. *City of Anaheim, supra,* 768 F.2d at p. 1049.) The former category is equally vague and subjective absent some guidance as to how "available area" is to be determined. As noted *ante,* objective criteria can be established readily for making such an assessment.

The "number of petitioners who wish to engage in such activities" does provide a measurable standard relevant to the decision to be made. However, it is meaningless standing alone. Without definite, objective guidelines to which it may be related, the standard provides no means for determining the issues under consideration in rules 4 and 5. Moreover, the unwritten rule limits petitioners to a maximum of two persons. Again, given the size of the facility at issue in the instant matter and the lack of justification provided, that restriction is unreasonably narrow and impermissibly infringes on the right to select a reasonable manner of engaging in expressive activity. (See *Dillon* v. *Municipal Court, supra,* 4 Cal.3d at pp. 869-870; cf. *California Newspaper Publishers Assn., Inc.* v. *City of Burbank, supra,* 51

Cal.App.3d at p. 54.) However, written criteria such as those outlined *ante* would provide the necessary objective guidance.

Finally, while the "potential for conflict" and concern with "safety" are too vague and overbroad, it is possible to craft objective criteria which meet those concerns: (1) Whether the planned manner of presentation of the expressive activity is so confrontational in nature, e.g., through the use of "fighting words" or group chanting, it is likely to embroil other groups or the general public in open conflict; (2) whether groups with competing views or incompatible political philosophies, i.e., the Ku Klux Klan and the NAACP or the Jewish Defense League, pro-life and pro-choice groups, have requested the use of the same general area on the same date and during the same hours; and (3) whether the planned activity, by its size and/or timing, threatens to block the flow of traffic or create a hazardous degree of congestion.

Plaintiffs argue the constitutionality of these rules and others which provide broad discretion without the safeguard of objective standards must be considered in light of the constitutional purpose served in circumscribing the exercise of discretion by requiring the use of objective standards. They point to the acknowledged principle that discretion must be circumscribed because unbounded discretion permits a decision to be based on the content of expression (*Dillon, supra,* 4 Cal.3d at pp. 869-870) and the unwritten rule that Plaza management is not to concern itself with the content of expression. They argue, since they have guarded against the vice of unbounded discretion the rules are valid. This argument overlooks the nature of the subjective determinations presently to be made: First, will the expressive activity be permitted or does it "adversely affect the . . . environment, atmosphere or image?" Second, based on the area available, the "potential for conflict" and "safety," where will the activity take place? Third, based on those same factors, how many persons will be permitted to take part? Notwithstanding plaintiffs' unwritten rule, all of those determinations readily may focus on the content of expression. Absent objective guidance, how else is management to perceive an "adverse effect" or a "potential for conflict?" The unwritten rule cannot adequately substitute for the use of definite, objective guidelines.

Rule 6 requires that petitioners use only furniture approved by management and locate that furniture only "as prescribed by . . . management . . . ." An unwritten rule states the Plaza will provide a table with table cloth and two chairs—no other furniture. This provision operates in a fashion similar to Rule 3 and its companion unwritten rule. Accordingly, to avoid running afoul of the same constitutional defect, it must be interpreted

as prohibiting all other furniture; otherwise, it again confers on Plaza management unbounded discretion. While the Plaza's legitimate concerns amply justify exercising control over the type and appearance of furniture to be used by providing only certain items and guarding against undue congestion or interference with plaza business by so limiting quantity, Rule 6 and its unwritten companion must be integrated in one written rule. Applicants are entitled to clear, written advance notice as to precisely what will be approved.

■■■ Rule 7 makes any posters, placards or displays subject to management approval and leaves their location and method of display within management's sole discretion. There are no definite, objective guidelines provided. The trial court modified rule 7 to limit management approval to such considerations as number and size, rather than content, but the modification will not suffice to save the rule. The number and size of posters or displays, as well as their method of display and location, all entail decisions which are likely to be influenced by content in the absence of specific guidance. Like others of plaintiffs' rules, rule 7 must fall as unconstitutionally overbroad.

Again, however, we stress the possibility of crafting the objective criteria necessary. Plaintiffs may wish to consider the general scheme of signs and displays permitted for special commercial exhibits and establish sizes and quantities which will be approved. Any proposed exceptions could be governed by considering whether the number and/or size of signs, posters or placards will interfere with and/or directly compete with business displays or logos. Further, plaintiffs could regulate style, as opposed to content, requiring that it be compatible with the general aesthetics of the mall, i.e., neat in appearance. The use of "fighting words," obscenities, grisly or gruesome displays or highly inflammatory slogans likely to provoke a disturbance, of course, could be prohibited. Examples of the latter would be pictures of aborted fetuses, gross racial caricatures or slogans such as "kill the pigs now."

■■■ Defendants characterize rule 8 as a prior restraint on free expression. The rule prohibits petitioners from making an "express or implied representation to any person within the center or on center property that the owner or the manager of the center sponsors or supports any view, belief, or request contained in any petition, statement or literature being disseminated or exhibited on center property."

Since a shopping center is a business establishment open to the public for use at its pleasure, the views of those engaging in expressive activity are not

likely to be identified by the public with those of the owner. (*Pruneyard Shopping Center* v. *Robins* (1980) 447 U.S. 74, 87 [64 L.Ed.2d 741, 756, 100 S Ct 2035].) Moreover, the owner may protect him or herself by expressly disavowing those views, i.e., by posting a sign. (*Ibid.*) Defendant's view of rule 8 is that it puts the burden on them, imposing a prior restraint on their expression, when there are less restrictive means of protecting plaintiffs' interests. Insofar as rule 8 restrains speech, it restrains only that which is unprotected in the first instance—expressions which could be considered fraudulent representations or defamatory to plaintiffs. In actuality, the rule imposes no more of an unconstitutional restraint than does a statute which prohibits the exhibition of an obscene film; defendants simply are put on notice that they are not privileged to misrepresent plaintiffs' sponsorship or advocacy of their views—nothing more. So interpreted, rule 8 suffers from no constitutional defect.

Rule 9 prohibits the use of lights, loudspeakers or other electrical or mechanical equipment, while rule 10 prohibits the use or operation of any musical instrument or sound reproduction device "in such manner as to cause any sound or noise which, in the reasonable belief of the center management office, may be disturbing or offensive." In substance, rule 10 leaves the determination of whether any musical instrument or sound device may be used in expressive activity solely within the discretion of management. That discretion is unbounded and unguided by any objective standard. Whether a sound is "disturbing" or "offensive" necessarily involves the same kind of subjectivity as do "esthetics," "well-being" and "safety." (See *City of Indio* v. *Arroyo, supra,* 143 Cal.App.3d at pp. 160-161.) Hence, rule 10 is unconstitutionally overbroad.

Here, too, plaintiffs can fill the void with reasonably objective criteria, i.e.: (1) Whether the sound device will create noise of sufficient volume to impinge on the hearing and peace of the general public, as opposed to those persons within a few feet of petitioners; (2) whether the device will be used in a highly confrontational manner likely to create a disturbance, e.g., to play discredited anthems or slogans akin to "fighting words"; and (3) whether the planned use of the device is highly inflammatory. (See examples set forth *ante,* in discussing rule 7.)

Rule 9 prohibits the use of lights, loudspeakers or other mechanical or electrical equipment. A prohibition against lights or loudspeakers is entirely justifiable in the protection of the Plaza environment and its peaceful use and enjoyment. Moreover, the Plaza certainly is not obliged to furnish petitioning parties with electrical power. The balance of the apparently sweeping restriction against all electrical or mechanical equipment must be

read with rule 10, which permits approval of the use of musical instruments or sound devices. Given the operation of rule 10, the broad restrictions of rule 9 do not run afoul of the principle that the selection of an appropriate manner of engaging in expressive activity may not be precluded by plaintiffs' rules. (*Dillon* v. *Municipal Court, supra,* 4 Cal.3d at pp. 869-870; cf. *California Newspaper Publishers Assn., Inc.* v. *City of Burbank, supra,* 51 Cal.App.3d at p. 54.) It follows that rule 9, as interpreted here, is constitutionally valid.

Rule 11 prohibits the solicitation of "contributions or donations from anyone on center property," as well as "the sale of any items or services on said property." The trial court found this rule to be constitutionally defective insofar as it prohibited the solicitation of contributions or donations and exempted defendants from compliance to that extent. On appeal, defendants do not challenge the balance of the rule, but plaintiffs do challenge the trial court's limitation. Accordingly, we defer consideration of that issue.

■ Rule 12 requires that petitioners "not impede or interfere with the business of any center tenants, employees or personnel, nor shall they approach, detain, or in any way impede or interfere with the smooth flow and free passage of center patrons, customers or personnel through the access ways of the center." Defendants characterize the "impede or interfere" language as overbroad and vague. However, such language has been upheld as sufficiently narrowly drawn "to avoid arbitrary and unnecessary curtailment of freedom of speech . . ." (*Kash Enterprises, Inc.* v. *City of Los Angeles* (1977) 19 Cal.3d 294, 303 [138 Cal.Rptr. 53, 562 P.2d 1302].) Hence, defendants' challenge must fail.

The trial court found rule 12 to be infirm insofar as it prohibits the "approach" of patrons and, again, exempted defendants from compliance to that extent. Plaintiffs also challenge the court's ruling in this regard. Hence, the validity of that exemption will be considered together with the ruling on rule 11.

■ Defendants challenge rule 13 as impermissibly imposing a penalty for the exercise of rights of free expression. Rule 13 confers upon Plaza management discretion to determine whether "the measure of the proposed political petitioning activity creates a risk of injury or damage to person or property, and . . . such a risk warrants special insurance protection," which the applicant must then provide. "Risk of injury" is yet another general and subjective standard vulnerable to arbitrary or content-related determination. It is closely akin in value as a standard to "danger to pub-

lic"; in a word, it is fatally defective. (*Hague* v. *C.I.O.* (1939) 307 U.S. 496, 516 [83 L Ed 1423, 1437, 59 S.Ct. 954].) Neither is there any indication as to how management is to determine the risk "warrants special insurance protection." In its totality, rule 13 is unconstitutionally overbroad.

Once again, it is possible for plaintiffs to craft the necessary objective criteria, i.e.: (1) Whether there is a prior history of injury to persons or property when this group engages in expressive activity; (2) whether there is a prior history of injury to persons or property when similar groups engage in expressive activity; (3) the historical scope of the risk and whether it exceeds the minimal or inconsequential; (4) whether the risk can be lessened or eliminated by adjusting the time, date, place or planned manner of expression; and (5) if so, whether the applicant is willing to make such adjustments.

Plaintiffs sought a preliminary injunction requiring defendants to submit to their application process and to comply with all rules and regulations. With very few exceptions, the trial court granted that relief. ▪ Since a significant part of plaintiffs' application process and by far the majority of the written and unwritten rules are constitutionally defective,[1] it is clear plaintiffs were not entitled to that relief. It follows that the trial court erred in granting a preliminary injunction. (*People* v. *Pacific Land Research Co.* (1977) 20 Cal.3d 10, 21 [141 Cal.Rptr. 20, 569 P.2d 125].)

## II

▪ Defendants further contend the trial court erred in issuing a temporary restraining order, in that the invocation of the plaintiffs' rules and regulations impermissibly restricted defendants' exercise of their First Amendment rights. We cannot agree.

All parties agree the issues pertaining to the temporary restraining order are now moot. Defendants nevertheless urge this court to reach them. ▪ Notwithstanding that they have become moot, the courts may make an exception and consider issues raised on appeal with respect to ex parte restraining orders. As noted in *United Farm Workers of America* v. *Superior Court* (1975) 14 Cal.3d 902, 906 [122 Cal.Rptr. 877, 537 P.2d 1237], these orders can and do have a critical impact on the exercise of

---

[1] Contrary to the dissent's characterization, our "heightened scrutiny and detailed rule-by-rule analysis," while based in part on federal constitutional standards, is limited to those principles implicit in *Robins'* firm reliance on *In re Hoffman, supra,* 67 Cal.2d 845. Moreover, as we noted *ante,* at pages 1208 and 1209 the instant matter differs substantially from *Robins* in the significant public interdependence with the private enterprise.

fundamental rights. "Yet because of their limited duration, orders of this nature elude appellate review." Hence, when a case poses an issue of broad public interest, likely to recur, an appellate court may exercise its "inherent discretion" to resolve the issue. (*Ibid.*)

The only issue raised with respect to the instant matter which might fall within the *United Farm Workers* exception is the Christmas holiday proscription against all petitioning activity. Given the likelihood this issue will arise again, yet elude review, we consider the case at bar appropriate for the exercise of this court's discretion to resolve the propriety of the holiday ban.

■ As *In re Hoffman, supra,* 67 Cal.2d at p. 853 notes: "In areas normally subject to congestion, . . . [protected] activities can be prohibited. [Citations.]" The evidence unequivocally establishes that the courtyard areas of the Plaza, particularly Garfield Court, are subject to a high degree of congestion during the Christmas holiday period. In addition to all regular features, the Plaza then accomodates a large Christmas tree, a Santa Claus display, a gingerbread house display and auction, an automobile raffle, booths for gift wrapping, mailing and gift certificates, a toy collection facility and various story book displays. Moreover, quite apart from the high degree of congestion created by the mere existence of these activities, pedestrian traffic increases substantially. While defendants did present evidence of light pedestrian traffic at 6 p.m. on December 23, the foregoing evidence nevertheless justified the trial court issuing the temporary restraining order to the extent it enforced the Christmas holiday ban on petitioning activity. Plaintiffs had the right and responsibility to keep the courtyard area open and available for movement. (Cf. *Cox* v. *Louisiana* (1965) 379 U.S. 536, 554 [13 L.Ed.2d 471, 484, 85 S.Ct. 453].) We note, however, that the ban at issue never was reduced to writing. Inasmuch as applicants are entitled to clear, written notice of such proscriptions, any future ban should be set forth in writing, setting forth the dates during which it is in effect.

### III

■ Plaintiffs assert the trial court erred in invalidating rules 11 and 12 insofar as they proscribe the solicitation of political funds or political petitioners' approach of Plaza patrons. We agree in part.

Plaintiffs rely on *Intern. Soc. for Krishna* v. *New Jersey Sports, etc.* (3d Cir. 1982) 691 F.2d 155, 159 and *Heffron* v. *Int. Soc. for Krishna Consc.* (1981) 452 U.S. 640 [69 L.Ed.2d 298, 101 S.Ct. 2559] for the proposition

that the solicitation of funds is not pure speech; hence, they argue, it is entirely permissible to prohibit the solicitation of political contributions on Plaza property. While the solicitation of political or other funds to be used to support the promulgation of views is indeed not "pure speech," it is activity protected by the First Amendment. (*Intern. Soc. for Krishna, supra,* 691 F.2d at p. 159; *Carreras* v. *City of Anaheim, supra,* 768 F.2d at p. 1045.)

Nevertheless, where the locale is not a public forum, solicitation need not be permitted. (*Intern. Soc. for Krishna, supra,* 691 F.2d at pp. 159-160.) Neither must solicitation be permitted when it is basically incompatible with the normal character and function of the facility. (*Id.,* at pp. 161-162.) In the instant matter, the solicitation of political funds is entirely incompatible with the normal character and function of the Plaza. The Plaza exists as a center of commerce; its function is to facilitate the ease of commerce and to promote the business of its merchant tenants. Any activity seeking to solicit political contributions necessarily interferes with that function by competing with the merchant tenants for the funds of Plaza patrons. Since solicitation does interfere with the basic function of the Plaza, plaintiffs are entirely within their rights in prohibiting such activity. (*Ibid.*) It follows that the trial court erred in invalidating rule 11 insofar as it proscribes the solicitation of political funds.

■ Plaintiffs also maintain defendants lack standing to challenge the solicitation prohibition, in that they did not seek to solicit funds. This viewpoint overlooks the nature of the instant action. In addition to injunctive relief, plaintiffs sought a declaration that its rules and regulations were constitutionally valid and enforceable. This conferred upon the trial court all necessary jurisdiction to decide the issue.

■ With respect to rule 12, plaintiffs rely on *Kash Enterprises, Inc.* v. *City of Los Angeles, supra,* 19 Cal.3d at pages 303-304 [138 Cal.Rptr. 53, 562 P.2d 1302], which upheld language prohibiting acts which "impede or obstruct or unreasonably interfere" with others. That language does, indeed, mirror part of rule 12 with which the trial court had no quarrel. The prohibition against "approaching" mall patrons stands in a different posture, however. As the trial court noted, "approaching" covers a far broader range of activity than physically impeding or obstructing persons and need not interfere with their passage or conduct of business in any manner. As a consequence, the proscription is overbroad, encompassing lawful, as well as unlawful, activity. (*Smith* v. *Silvey* (1983) 149 Cal.App.3d 400, 406-407 [197 Cal.Rptr. 15]; see also *In re Berry* (1968) 68 Cal.2d 137, 155 [65 Cal.Rptr. 273, 436 P.2d 273].) It follows that it is constitutionally impermissible.

In sum, while rule 11 is entirely valid, rule 12 imposes an unconstitutional restraint on defendants' exercise of free expression. Accordingly, the trial court did err in partially invalidating rule 11 but was correct in invalidating rule 12's proscription against approaching Plaza patrons.

The order granting a preliminary injunction is reversed; the order granting a temporary restraining order is affirmed. Defendants to have costs on appeal.

Lucas, J., concurred

**HANSON (Thaxton), J.,** Concurring and Dissenting.—I concur with the majority opinion in respect to the temporary restraining order pertaining to plaintiff Plaza's rules and regulations specifically concerning the holiday ban.

I also concur with the majority opinion's treatment of the issues relating to plaintiff Plaza's cross-appeal in respect to rules 11 and 12 of Plaza's "Rules for Political Petitioning on Shopping Center Property" (appen. A) which were attached to its complaint.

However, I respectfully disagree with the majority opinion's general treatment of the remaining paragraphs contained in Plaza's rules and the application procedure. This disagreement stems from what I perceive to be the applicable standard of review, language in *Robins* v. *Pruneyard Shopping Center* (1979) 23 Cal.3d 899 [153 Cal.Rptr. 854, 592 P.2d 341], and the belief that generally we should decide each issue on the narrowest possible grounds on a case-by-case basis.

The standard of review with regard to the trial court's grant of a preliminary injunction is well-established. The decision to grant a preliminary injunction "rests in the sound discretion of the trial court. . . ." A trial court will be found to have abused its discretion only when it has "exceeded the bounds of reason or contravened the uncontradicted evidence." (*Continental Baking Co.* v. *Katz* (1968) 68 Cal.2d 512, 527 [67 Cal.Rptr. 761, 439 P.2d 889]; see also *City of Torrance* v. *Transitional Living Centers for Los Angeles, Inc.* (1982) 30 Cal.3d 516, 519 [179 Cal.Rptr. 907, 638 P.2d 1304].) The burden rests with the party challenging the injunction to make a clear showing of an abuse of discretion. (*IT Corp.* v. *County of Imperial* (1983) 35 Cal.3d 63, 69 [196 Cal.Rptr. 715, 672 P.2d 121].)

With regard to the First Amendment rights involved in this appeal, however, the majority fails to apply the proper standard of review. The

problem arises partly from the unusual nature of the constitutional right established in *Robins* v. *Pruneyard Shopping Center, supra,* 23 Cal.3d 899 (opn. by Newman, J., with Bird, C. J., Tobriner and Mosk, JJ., conc. Separate dis. opn. by Richardson, J., with Clark and Manuel, JJ., conc.).[1] *Pruneyard* holds that the California Constitution guarantees First Amendment rights exceeding those guaranteed by the United States Constitution. The United States Supreme Court, in *Pruneyard Shopping Center* v. *Robins* (1980) 447 U.S. 74 [64 L.Ed.2d 741, 100 S.Ct.2035], affirmed the California Supreme Court's holding, expressly declining to "limit the authority of the State to exercise its police power or its sovereign right to adopt in its own Constitution individual liberties more expansive than those conferred by the Federal Constitution." (*Id.,* at p. 81 [64 L.Ed.2d at p. 752].) So long as a state respects the federal constitutional minimum, it may define the maximum scope of constitutional rights. To echo the phrase of California Supreme Court Justice Stanley Mosk, so long as it rests its foundation on the federal floor, California may construct its own constitutional ceiling. (Mosk, *Beyond the Constitution* (Aug. 1987) 7 Cal.Law. 100.)

Since these enlarged First Amendment rights are creatures of state constitutional law, we must look to state law for the appropriate standard of reviewing private regulations of these state-created rights. The California Supreme Court in *Pruneyard,* however, has not expressly specified the standard for reviewing these regulations, except to say that they must be "reasonable." To clarify what this "reasonable" standard of review means vis-á-vis private regulation of public access to private property, it is helpful to recall the method by which federal courts analyze government limitations on public access to various sorts of public property.

Federal First Amendment cases link the standard of review to the type of property used by those seeking to exercise their rights of expression. "The

---

[1] It should also be noted that the facts in the instant case diverge somewhat from those in *Pruneyard*. First, in *Pruneyard,* the shopping center management informed the petitioners that they would have to leave the premises entirely because they did not have permission to solicit, suggesting that they continue their activities on the public sidewalk at the center's perimeter. In the case at bench, there was no blanket prohibition of First Amendment expressive activity; instead, the management permitted this activity, subject to time, place, and manner regulations. Second, the *Pruneyard* opinion, by citing statistics concerning the growth of suburban communities and the economic and social importance of suburban shopping centers, implied that barring First Amendment expression in such shopping centers would leave the public without an alternative forum in which to engage in—or to hear—First Amendment expression. Here, by contrast, we note that the shopping center lies at the very center of the downtown shopping, business, and government activity of a large city, which is itself a regional commercial, governmental, and cultural center. The area contains innumerable and well-traveled streets, parks, and other traditional public forums available for First Amendment expression in a way that the suburban shopping center in *Pruneyard* evidently did not.

existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." (*Perry Education Assn.* v. *Perry Local Educators' Assn.* (1983) 460 U.S. 37, 44 [74 L Ed 2d 794, 804, 103 S.Ct. 948].) The federal standard of review changes according to the position a particular type of public property occupies along a "spectrum" of various places in which First Amendment activity occurs. (*Id.,* at p. 45 [74 L.Ed.2d at p. 805].) There are three such categories.

First, in traditional, "quintessential public forums," such as streets and parks, the government may not prohibit all communicative activity. To enforce a content-based prohibition, the State must show it is necessary to serve a compelling state interest and is narrowly drawn to achieve that end. The State may enforce time, place, and manner of expression regulations which are content-neutral, narrowly tailored to serve a significant government interest, and leave ample alternative channels of communication open. (*Id.,* at p. 45 [74 L.Ed.2d at p. 804].) The standards governing a second category, a designated public forum—public property which the State has opened to the public for expressive activity—are identical to those governing a traditional public forum, as long as the State retains the facility's open, public character. (*Id.,* at pp. 45-46 [74 L.Ed.2d at pp. 804-805].)

A different standard, however, governs a third category: public property "not by tradition or designation a forum for public communication." (*Id.,* at 46.) "In addition to time, place, and manner regulations, the State may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." (*Id.,* at p. 46 [74 L.Ed.2d at p. 805].)

*Perry* leads to the conclusion that the further a particular parcel of property lies from a "traditional public forum," the lower the standard of review. For two reasons, a *Pruneyard*-type forum falls into none of the three *Perry* categories. First, it is privately owned. Second, the limitations on the public's access to the property originate not from any governmental or other public entity, but from the private owner. Thus, while "[f]ederal principles are relevant" in determining the standard of review to be accorded property in this fourth category, so long as federal rights are protected, federal standards of review are not conclusive. (*Robins* v. *Pruneyard Shopping Center, supra,* 23 Cal.3d 899, 909.) The standard of review for this "broader zone" of First Amendment expression, guaranteed by the Califor-

nia Constitution (*Blatty* v. *New York Times Co.* (1986) 42 Cal.3d 1033, 1041 [232 Cal.Rptr. 542, 728 P.2d 1177]), is lower than the federal standards of review, and a matter for articulation by the California courts.

*Pruneyard* states that the California Constitution "protect[s] speech and petitioning, *reasonably* exercised, in shopping centers even when the centers are privately owned." (*Robins* v. *Pruneyard Shopping Center, supra,* 23 Cal.3d 899, 910; italics added.) The opinion noted that property owners, like the government, may regulate expressive activity as to time, place, and manner, "under *reasonable* regulations adopted by [the property owner] to assure that these activities do not interfere with normal business operations." (*Id.,* at pp. 909-911; italics added.)

We are not dealing here with an ordinance or a statute but "rules" obviously prepared, in good faith, with *Pruneyard* in mind, by property owners who operate a mall for commercial purposes.

The superior court in its "Statement of Decision" (appen. B) also specifically noted that it considered *Pruneyard*. Moreover, its rulings as to each paragraph in the "rules" as applied only to the litigants herein were an effort to reach a reasonable accommodation of the rights of all parties. The trial court necessarily could not make a ruling that would be dispositive of proposed activities of persons and organizations not before the court.

After reviewing the record, Plaza's "Rules" (appen. A), and the "Statement of Decision" (appen. B) underpinning the preliminary injunction, except for Plaza's "Rules" 11 and 12, I cannot say that the superior court "exceeded the bounds of reason or contravened the uncontradicted evidence."

The majority's heightened scrutiny and detailed, rule-by-rule analysis is based on federal constitutional principles. The type of forum involved in the case at bench, and the California *Pruneyard* "reasonableness" and the *Katz* "abuse of discretion" standards of review, in my opinion, make the majority's detailed analysis unnecessary. The majority opinion attempts to clarify the legal requirements applicable to regulations of First Amendment access to a *Pruneyard*-type forum. The purpose of the majority's treatment is directed at "foreshortening the prospects of increased litigation" but in effect amounts to a rewriting of Plaza's rules. While this purpose may be laudable, in my view, it has the flavor of another incremental unwarranted whittling away of private property rights and the management of said pri-

vate property. Moreover, because of a myriad of unforeseen circumstances such a detailed treatment for prospective purposes may increase the likelihood of future litigation, rather than reduce it. In my view it is preferable to follow the traditional procedure of deciding the issues raised in the case before us on the narrowest possible ground, and to decide any future litigation involving a *Pruneyard*-type forum on a case-by-case basis.

I would affirm the order granting a temporary restraining order. I would also affirm the superior court's order granting a preliminary injunction, except to that portion of the order pertaining to paragraphs 11 and 12 of plaintiff Plaza's "Rules for Political Petitioning on Shopping Center Property," which I would reverse. I would order each of the parties to bear their own costs.

A petition for a rehearing was denied August 26, 1987. Hanson (Thaxton), J., was of the opinion that the petition should be granted. The petition of the plaintiffs and appellants for review by the Supreme Court was denied October 29, 1987.

---

APPENDIX A

## RULES FOR POLITICAL PETITIONING ON SHOPPING CENTER PROPERTY

"The rules are promulgated by the management of _____ The Plaza Pasadena shopping center (center) for the purpose of reasonably regulating as to time, place and manner the activities of all individuals, groups and organizations (hereinafter referred to as petitioners) engaged in "political petitioning" on said center's property. "Political petitioning" is defined as any conduct by which an individual obtains signatures for any petition directed to any governmental or political body. These Rules shall not be deemed or construed to permit any activity other than political petitioning, and the owners of the center reserve the right to prohibit any activity other than that specifically described in these Rules and sanctioned by law.

"1. Prior to engaging in political petitioning, a petitioner must notify the center management office and provide it with the name, address and signature of a responsible adult who, by said signature, expressly accepts full liability for damage, costs or expenses resulting from the proposed activity. Said liability shall include, but is not limited to, maintenance costs for cleaning up litter and expenses resulting from damage to persons or property or both.

"2. If leaflets or other material are to be handed out on the center property, the petitioner must post a $50.00 security deposit to cover the cost of cleaning up litter which results from such activity. The deposit, less any expense incurred by center for cleaning up litter, shall be refunded approximately two weeks after said activity has ended.

"3. All petitioners engaged in political petitioning shall use only that portion of the center property expressly designated for that purpose by the center management office.

"4. The number of petitioners who may engage in political petitioning on the center property at a particular time shall be determined by the center management office. This determination shall be based on the following factors: (1) The area available for such activities; (2) the number of petitioners who wish to engage in such activity at one particular time; (3) the potential for conflict between petitioners or between petitioners and members of the public; and (4) the safety of the public and center property.

"5. The time during which political petitioning by a particular petitioner may take place shall be determined by the center management office. This determination shall be based on the factors specified in Rule 4.

"6. Only that furniture (i.e. table, chairs and benches) approved by the center management office shall be used on the center property for political petitioning. Said furniture shall be located as prescribed by the center management office.

"7. Posters, plaquards [sic] and displays as well as their location and method of display shall be subject to the approval of the center management office. In no event shall such materials be affixed to any portion of the center property.

"8. Petitioners shall make no express or implied representation to any person within the center or on center property that the owner or the manager of the center sponsors or supports any view, belief, or request contained in any petition, statement or literature being disseminated or exhibited on center property.

"9. No lights, loudspeakers or other electrical or mechanical equipment, device or appliance shall be used for any purpose by petitioners at the center.

"10. No petitioner shall use, operate or permit to be played any musical instrument or other device for the production or reproduction of sound in such a manner as to cause any sound or noise which, in the reasonable belief of the center management office, may be disturbing or offensive.

"11. Petitioners shall not solicit contributions or donations from anyone on center property nor shall they engage in the sale of any items or any services on said property.

"12. Petitioners shall not impede or interfere with the business of any center tenants, employees or personnel, or shall they approach, detain or in any way impede or interfere with the smooth flow and free passage of center patrons, customers or personnel through the access ways of the center.

"13. If in the good faith judgment of the center management office the nature of the proposed political petitioning activity creates a risk of injury or damage to person or property, and that such a risk warrants special insurance protection, then the petitioner planning to engage in such activity must purchase and carry the necessary insurance coverage. Said insurance policy shall name as additional insureds Hahn Property Management Corporation, the center owner and the center Merchants' Association and petitioner shall provide the center manager prior to commencement of political petitioning with a valid certificate of insurance evidencing the same.

"14. Any petitioners engaging in political petitioning shall conduct themselves with proper decorum and must refrain from any loud or raucous activity which will annoy or offend the public or any tenants at the center. Any petitioner engaging in political petitioning who defaces or otherwise abuses center property or persons on center property shall be subject to immediate removal and legal action.

APPENDIX B

Original Filed
Jan. 13, 1986
COUNTY CLERK

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| H-CHH ASSOCIATES, a California limited partnership, doing business as PLAZA PASADENA, and HAHN PROPERTY MANAGEMENT CORPORATION, a California corporation,<br><br>　　　　Plaintiffs,<br><br>v.<br><br>CITIZENS FOR REPRESENTATIVE GOVERNMENT, an unincorporated association, dba PASADENA CITIZENS FOR REPRESENTATIVE GOVERNMENT, DALE L. GRONEMEIER, JOHN HINRICHS, OZRO ANDERSON, CHRIS SUTTON, JANE POE, JOHN ROE, AND DOES 1 through 1,000, inclusive,<br><br>　　　　Defendants. | Case No. C 580 408<br><br>STATEMENT OF DECISION |
| CITIZENS FOR REPRESENTATIVE GOVERNMENT, an unincorporated association; DALE L. GRONEMEIER,<br><br>　　　　Cross-complainants,<br><br>v.<br><br>HAHN PROPERTY MANAGEMENT CORPORATION; a California corporation; H-CHH Associates, a California limited partnership dba THE PLAZA PASADENA; ERNEST W. HAHN CO., INC., a California corporation; PATTI K. MAUDE; DOES 1001-1100 inclusive,<br><br>　　　　Cross-defendants. | |

I.　Motion by Plaintiff for Preliminary Injunction.

　　A.　In granting or denying any relief on this Motion, the Court shall at this preliminary injunction stage rule only on the rights of the named parties and not on the rights generally of the public or of groups not expressly made parties herein.

　　Additionally, as to defendant/cross-complainant Citizens for Representative Government, the claim for relief relating to the period from Thanksgiving through Christmas, 1985 is now moot and the Court shall not rule upon this issue. If this case has not gone to trial in November, 1986 and defendants/cross-complainants propose to engage in political activity during

the Thanksgiving-Christmas period at plaintiffs' premises, they may apply to the Court for appropriate relief.

B. The Court has reviewed and considered the "Rules for Political Petitioning on Shopping Center Property," (Exh. A, Complaint) as they apply to the proposed activity of defendant/cross-complainant Citizens for Representative Government and its officers, members and agents Dale L. Gronemeier, Ozro Anderson and Chris Sutton.

As so applied, the Court makes the following rulings as to each of the provisions of said "Rules" *as applied to the defendants/cross-complainants only.*

*Opening paragraph* (unnumbered); The definition of "political petitioning" is unreasonable to the extent it does not include distribution of written materials or solicitation of funds.

*Paragraph 1:* This provision is reasonable. Defendants/cross-complainants do not claim they are minors.

*Paragraph 2:* This provision is reasonable.

*Paragraph 3:* This provision is reasonable.

*Paragraph 4:* This provision is reasonable on its face. Whether it would be unreasonably applied would depend on the circumstances of the particular case. Defendants/cross-complainants have not shown that it would be unreasonably applied on any application filed by them for future activity.

*Paragraph 5:* This provision is reasonable on its face and the Court makes the same ruling as in paragraph 4 above.

*Paragraph 6:* This provision is reasonable.

*Paragraph 7:* This provision is reasonable as to the size, number, and location of posters, plaquards [*sic*] and displays. It is unreasonable as to approval of the content thereof to the extent the content falls within the definition of "political petitioning".

*Paragraph 8:* This provision is reasonable.

*Paragraph 9:* This provision is reasonable.

*Paragraph 10:* This provision is reasonable.

*Paragraph 11:* This provision is unreasonable to the extent it prevents defendants/cross-complainants from soliciting contributions to support the political causes they advocate. Otherwise, the provision is reasonable.

*Paragraph 12:* This provision is unreasonable to the extent it does not permit the "approach" of patrons by defendants/cross-complainants within a reasonably described radius of the location where the table is situated. Otherwise, the provision is reasonable.

*Paragraph 13:* This provision is reasonable on its face so long as the requirement of issuance is based upon articulato [*sic*] facts and not mere conjecture or speculation.

*Paragraph 14:* This provision is reasonable on its face. The term "loud and raucous activity" is not impermissibly vague.

C. Ruling as to "Registration Form."

The Court has reviewed this form. (Exh. A, Cross-complaint.) On its face, the Court finds it is reasonable. Requiring the names of persons making the application and the names of persons in charge of the activity is reasonable. Requiring the submission of a copy of the petition is a reasonable means of determining that the proposed activity involves "political petitioning" rather than other activity, e.g., commercial promotion or solicitation.

D. The Court grants plaintiffs' Motion for Preliminary Injunction restraining and enjoining defendant Citizens for Representative Government, an unincorporated association, it officers, members, employees and agents and the individual defendants Dale L. Gonemeier, Ozro Anderson and Chris Sutton, their agents, servants, and all persons acting in concert with any or all of the foregoing defendants from:

1. engaging in any political activity on the premises of Plaza Pasadena, Pasadena, California, including but not limited to parking areas physically connected therewith until said defendants have caused to be submitted to plaintiff an application or registration and have received approval by plaintiff for such activity;

2. violating or failing to comply with the rules and regulations adopted by plaintiffs except that such rules and regulations may not:

(a) regulate the political content of any sign, poster or display except as to the size of the sign, poster or display.

(b) prohibit solicitation of political contributions at the location designated for the political activity, provided, however, plaintiff may prescribe a reasonable radius surrounding the table beyond which defendants may not approach persons for contributions.

(c) prohibit defendants from approaching persons within a reasonable radius of the table where the political activity is permitted so long as defendants do not physically impede such person.

E. The preliminary injunction is conditioned upon plaintiff filing a $10,000 bond.

F. The Court reserves jurisdiction to modify or dissolve the preliminary injunction for good cause shown.

II. COMMENT OF THE COURT

A. The Court disagrees with the position of defendants/cross-complainants to the extent that they contend their right of political expression on the premises of a private shopping mall is subject to no less restraint than that on a public sidewalk or public premises. The Court is guided principally by the criteria in *Robins v. Pruneyard Shopping Center* 23 Cal 3d 899, 910, 911 which requires a shopping mall, such as here, to permit "a handful of additional orderly persons soliciting signatures and distributing handbills in connection therewith, under reasonable regulations adapted . . . to assure that these activities do not interfere with normal business operations. . ."

B. In its rulings above, the Court has attempted to reach a reasonable accommodation of the rights of all parties. At the same time, the Court recognizes that it cannot make a ruling that would be dispositive of proposed activities of persons and organizations not before the Court. Accordingly the rulings herein apply only to the parties before the Court.

IV. The restraining order issued herein on December 23, 1985 is continued in effect until January 17, 1986, 4:00 p.m. to allow plaintiffs to submit preliminary injunction.

DATED: Jan. 13, 1986

/s/ Warren H. Deering

WARREN H. DEERING
Judge of the Superior Court